2007 UT 49

**STATE of Utah, Plaintiff and Appellee,**

v.

**Edgar TIEDEMANN, Defendant and Appellant.**

No. 20050676.

Supreme Court of Utah.

June 29, 2007.

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Asst. Att'y Gen., T. Langdon Fisher, William Kendall, Salt Lake City, for plaintiff.

Linda M. Jones, Heidi Buchi, Heather Brereton, Patrick W. Corum, Salt Lake City, for defendant.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 Edgar Tiedemann is charged with three counts of murder, a first degree felony. This court granted Tiedemann's petition for interlocutory appeal from two pretrial orders. First, he appealed the pretrial order denying his motion to suppress statements allegedly obtained in violation of the state and federal constitutions and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Second, Tiedemann appealed the order denying his motion to dismiss based on the State's destruction of potentially exculpatory evidence.

## BACKGROUND

¶ 2 The State alleges that on November 2, 1991 Tiedemann shot and killed Susan Sessions, Charles Timerberman, and Scott Bunnell.[1] Sessions, Timerberman, and Bunnell were staying at Tiedemann's West Valley trailer home for the night. Following the shootings, the police took Tiedemann into custody where two police officers, Detective Ron Edwards and Sergeant Ed Spann, questioned him about the killings. In the course of questioning, Tiedemann confessed to the murders.

¶ 3 The interrogation was videotaped and transcribed in part. The officers began the interrogation by reading Tiedemann his *Mi-*

---

1. Scott Bunnell died in February 2001 due to the injuries he sustained on November 2, 1991. Accordingly, with respect to Mr. Bunnell, the origi-nal charge for attempted murder was changed to murder.

*randa* rights. When asked if he understood his rights, Tiedemann answered in the affirmative.[2] The officers then asked Tiedemann if he understood that he could stop the questioning at anytime, to which he responded "ya." The officers then asked Tiedemann if he still wished to speak with them at that time, and Tiedemann agreed. When asked by the officers if he was intoxicated, Tiedemann stated that he was intoxicated on Toluene, a paint thinner. The officers proceeded with the interrogation.

¶ 4 As the officers continued the questioning, they asked Tiedemann about the shootings. Specifically, Detective Edwards asked, "What happened to [Ms. Sessions]?" Tiedemann answered, "I don't want to talk about it." Detective Edwards responded, "You don't want to talk about it?" and Tiedemann responded, "No." Sergeant Spann, attempted to clarify exactly what Tiedemann did not want to talk about by asking, "What is it that you don't want to talk about?" Before Tiedemann responded, Sergeant Spann continued with, "You said murders in West Valley, where in West Valley?"

¶ 5 Sergeant Spann tried again to clarify Tiedemann's response by asking, "[w]hat part do you and what part don't you want to talk to us about?" Again, before Tiedemann clarified, Detective Edwards asked, "Edgar do you remember me reading [you your] rights earlier and you signing a waiver for us to search your home?" Tiedemann answered, "Ya." Detective Edwards continued questioning Tiedemann about the murders.

¶ 6 During the course of the interrogation, Tiedemann stated that he had "all kinds" of "mental problems." He informed the officers of a stroke he had in 1988. He told the officers, "I think I'm Adolf Hitler." He also claimed that "the devil" told him to shoot the victims. At the end of the interrogation, Tiedemann affirmed that the police had not threatened him or promised anything, but that he made the statements of his own free will. The entire interrogation lasted less than one hour.

¶ 7 The State originally charged Tiedemann with two counts of aggravated murder and one count each of attempted aggravated murder, aggravated kidnaping, and aggravated sexual assault. The charges were dismissed seven months later after Tiedemann was declared incompetent to stand trial. At that time, the State did not anticipate refiling charges because, based on his competency evaluation, Tiedemann was unlikely to ever be found competent to stand trial. Tiedemann was then civilly committed to the Utah State Hospital.

¶ 8 Two years later, in April 1994, the state evidence custodian notified the investigating officer that physical evidence from the case would be destroyed unless an objection was filed within thirty days. The officer made no objection, and the evidence was destroyed. The destroyed evidence included two revolvers, a Code R kit, a victim's wallet, heroin, an audio tape, a blood specimen, a make-up kit, drug paraphernalia, various items of victims' clothing, bedding, a bone fragment found on one victim's bed, a bottle of green liquid, a one gallon can of Toluene, .38 and .22 caliber bullets, bullet fragments, shell casings, hair and saliva samples, and gunshot residue from Tiedemann and one of the victims.

¶ 9 Not all of the evidence was destroyed. The evidence given to the defense in this proceeding included autopsy photos and reports on all three victims, toxicology reports on the victims, a rape report from St. Mark's Hospital, photos taken of weapons and ammunition, firearm analysis reports, transcripts of interviews taken from one of the shooting victims and the sexual assault victim, witness statements, a videotape of the interview with the sexual assault victim, and a videotape and photos of the crime scene.

¶ 10 In October 2002, the district attorney's office was notified that Tiedemann was going to be released from the Utah State Hospital. The State subsequently recharged him with three counts of murder, declining to refile the other felony counts. Following a preliminary hearing, the trial court found Tiedemann competent to stand trial and de-

---

2. Although the transcript of the interrogation recorded Tiedemann's response as being "inaudible," a viewing of the video reveals that Tiedemann, with head down and in a muffled tone, said "ya."

nied his pretrial motions to suppress his testimony and to dismiss the case due to destruction of evidence. This court granted Tiedemann's petition for interlocutory appeal from both rulings. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(h) (2002).

## STANDARD OF REVIEW

¶ 11 In reviewing the trial court's denial of Tiedemann's Motion to Suppress Illegally Obtained Statements, we review the trial court's factual findings for clear error and we review its conclusions of law for correctness. *State v. Troyer*, 910 P.2d 1182, 1186 (Utah 1995).

¶ 12 Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness. "However, because this question requires application of facts in the record to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *Chen v. Stewart*, 2004 UT 82, ¶ 25, 100 P.3d 1177.

## ANALYSIS

¶ 13 This case presents two issues: first, whether Tiedemann validly waived his *Miranda* rights and, if so, whether he subsequently, unambiguously invoked his right to remain silent; and second, whether the destruction of evidence in this case violated Tiedemann's due process rights under the state and federal constitutions. The court addresses these issues as follows: Part I of this opinion treats the Motion to Suppress the Confession as it relates to (A) whether Tiedemann waived his right to remain silent, and (B) whether Tiedemann subsequently reinvoked his right to remain silent; Part II deals with the destruction of evidence. This opinion contains the majority as to Part IA. The majority opinion of the court as to Part IB is contained in the separate opinion of Justice Durrant, joined by Justices Nehring and Parrish. The dissenting view in Part IB of this opinion is mine alone. Part II of this opinion contains the majority view of the court on the destruction of evidence question.

In a separate opinion, Justice Wilkins dissents as to Part IB and as to Part II.

## I. MOTION TO SUPPRESS THE CONFESSION

¶ 14 We first address whether the district court was correct in denying Tiedemann's request to suppress his confession. Tiedemann argues that he never gave a voluntary waiver of his right to remain silent, but rather, that the police took advantage of his known mental impairment to improperly evoke a waiver and confession from him. Tiedemann also argues that, even if he gave a valid initial waiver, he later unambiguously raised his right to remain silent, and the officers failed to honor that request in violation of his due process rights.

¶ 15 This court addressed the threshold requirements for a valid waiver of *Miranda* rights and a subsequent invocation of those rights in *State v. Leyva*, 951 P.2d 738 (Utah 1997). *Leyva* firmly established that "[t]he questions of waiver of *Miranda* rights and of postwaiver invocation of those rights are entirely separate." *Id.* at 743. We therefore address Tiedemann's initial waiver and the subsequent raising of his right to remain silent separately. If the initial waiver was not valid, the statements must be suppressed. If, however, the initial waiver was valid, we must determine if Tiedemann later validly invoked his right to remain silent.

### A. *Tiedemann's Initial Waiver Was Valid*

¶ 16 With regard to the initial waiver of *Miranda* rights, this court has noted, in accordance with federal case law, that a " 'heavy burden' rests on law enforcement officers 'to demonstrate that the defendant knowingly and intelligently waived' his *Miranda* rights." *Leyva*, 951 P.2d at 743 (quoting *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). The burden therefore rests on the State to show that a suspect's waiver of *Miranda* rights was clear and unambiguous, as well as voluntary.

¶ 17 In this case, the interrogating officers read Tiedemann his rights and asked him if he understood them. Tiedemann, although

appearing distant and with his head lowered, answered in the affirmative. Further, Tiedemann responded in the affirmative to each of the following questions: (1) "Do you understand that you can stop this questioning at anytime?" (2) "If you cannot afford an attorney, we will provide one for you. Do you understand that?" and (3) "Do you still wish to speak to us at this time?"

¶ 18 In its Memorandum Decision, the district court concluded that the officers did not use coercive tactics to gain the *Miranda* rights waiver. Having reviewed the transcript and video of the interrogation, we agree. The officers did not use "false friend" or "half truth" tactics. They made no threats or promises. The interrogation was less than one hour in length. The officers did not deny any special requests by the defendant. We could not find a single instance in which the officers mistreated Tiedemann or acted unethically in any way. Although Tiedemann was admittedly intoxicated at the time and was later found to be incompetent to stand trial, his mental condition alone, absent some abuse by the officers, is not enough to render his waiver invalid. *See Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); *State v. Rettenberger*, 1999 UT 80, ¶ 17, 984 P.2d 1009 ("Although ... a determination of involuntariness cannot be predicated solely upon a defendant's mental state, his mental state is relevant to the extent it made him more susceptible to mentally coercive police tactics." (internal quotation marks omitted)).

¶ 19 Because Tiedemann's waiver was clear and unambiguous, and because he was not coerced in any way, we conclude that Tiedemann effectively waived his *Miranda* rights.

## B. *Tiedemann Unambiguously Reasserted His Right to Remain Silent*

¶ 20 Because Tiedemann validly waived his *Miranda* rights, in order for this court to

reverse, I believe we must conclude that his later attempt to invoke his right to remain silent was unambiguous. The right to terminate questioning is a "critical safeguard" of the right to remain silent guaranteed by the Fifth Amendment.[3] *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). In *Miranda*, the United States Supreme Court underscored the importance of a suspect's right to end an interrogation and provided general operational guidance when it stated that questioning must stop once a suspect "indicates in any manner, at any time ... during questioning, that he wishes to remain silent." *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see also Mosley*, 423 U.S. at 100, 96 S.Ct. 321.

¶ 21 The more difficult question, one left unanswered in *Miranda*, is how law enforcement officials are to know when a suspect has given a sufficient "indication" of a wish to remain silent. The United States Supreme Court answered this question in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Mr. Davis was accused of beating a sailor to death with a pool cue after the sailor had reneged on a billiards wager. *Id.* at 454, 114 S.Ct. 2350. After waiving his *Miranda* rights and submitting to an hour and a half of interrogation, Mr. Davis mused, "Maybe I should talk to a lawyer." *Id.* at 455, 114 S.Ct. 2350. The Court concluded that this statement was too equivocal to serve as an invocation of Mr. Davis' right to counsel. *Id.* at 462, 114 S.Ct. 2350. The Court held that a suspect's reassertion of the right to counsel " 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " *Id.* at 459, 114 S.Ct. 2350 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). Mr. Davis' choice of the word "maybe" injected sufficient equivocation into his comment to allow the officers to continue questioning him.

¶ 22 I measure Tiedemann's statement "I don't want to talk about it" against the core

---

**3.** As this court noted in *Leyva*, because we have never established the existence of *Miranda* protections under the Utah Constitution, issues concerning *Miranda* are analyzed using federal law and the provisions of the United States Constitution. *Leyva*, 951 P.2d at 743.

*Davis* test as modified to encompass the right to remain silent. I find it impossible to extract ambiguity from the following critical question and answer exchange between Detective Edwards and Tiedemann:

Det. Edwards: What happened to [Ms. Sessions]?

Tiedemann: I don't want to talk about it.

Det. Edwards: You don't want to talk about it?

Tiedemann: No.

¶ 23 I find Tiedemann's statement, "I don't want to talk about it," and subsequent confirmation of his desire not to talk about it an unambiguous invocation of his right to remain silent. Contrary to the view expressed by Justice Wilkins, I believe that this pivotal exchange between Detective Edwards and Tiedemann clearly passed the *Davis* test. The law cannot deprive defendants of their constitutional rights based on failure to use precise terminology. Officers need to be alert to various statements and behaviors expressed by defendants that meet the required threshold of clarity. In my view, Tiedemann met his burden to unambiguously invoke his constitutional right to remain silent with his statement "I don't want to talk about it," followed by repeated silence in response to subsequent questions.

¶ 24 What remains ambiguous, however, is the scope of Tiedemann's invocation. The antecedent of the pronoun "it" is unclear. "It" could refer to "what happened to [Ms. Sessions];" or "it" could refer to "[t]he murders out there at West Valley," a response Tiedemann made to a question only moments before the exchange quoted above; or "it" could refer to all of the events related to the murders. The United States Supreme Court has extended to criminal suspects "[t]hrough the exercise of [this] option to terminate questioning" the right to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Mosley*, 423 U.S. at 103–04, 96 S.Ct. 321. I recognize that interrogating officers who know that a suspect has reclaimed his or her right to remain silent but do not know the scope of the reclamation have a difficult

line to walk. The difficulty arises because questions posed by interrogators in this setting will seldom elicit answers that clarify the scope of the suspect's right to remain silent without also including inculpatory statements. This problem may be solved by disqualifying from consideration any inculpatory statements made in response to questions posed by interrogators who are in the process of attempting to clarify the scope of a reasserted right to remain silent. Such a rule will relieve law enforcement of the daunting task of formulating questions that would clarify the scope of the *Miranda* invocation but not invite inculpatory statements.

¶ 25 Given Tiedemann's unambiguous invocation of his right to remain silent, but accompanied by ambiguity as to the scope of such an invocation, I conclude that the police officers were entitled either to stop their interrogation completely or to properly seek clarification regarding the scope of Tiedemann's invocation. Therefore, their question "What don't you want to talk about?" [4] was legitimate. However, on the two occasions Tiedemann was asked to clarify what "it" was that he did not want to talk about, he was denied the opportunity to answer. In the first instance, Sergeant Spann asked Tiedemann two questions at once, "What is it that you don't want to talk about?" and "You said murders in West Valley, where in West Valley?" Tiedemann answered only the second question regarding the location of the murders. In the second instance, Sergeant Spann asked Tiedemann "[w]hat part do you and what part don't you want to talk to us about?", but before Tiedemann answered, Detective Edwards asked, "Edgar[,] do you remember me reading you[r] rights earlier and you signing a waiver for us to search your home?" Tiedemann answered only Detective Edward's question, and Detective Edwards continued asking Tiedemann about the shootings.

¶ 26 I agree with Justice Wilkins that "the officers were careful to inquire as to what Tiedemann did, and did not, want to talk about." *Infra* ¶ 61. But, in my view, the officers' actions demonstrated that they recognized that Tiedemann wished to invoke his

4. The transcript mistakenly substitutes "why" for "what."

right to remain silent. When their careful inquiry failed to elicit clarity regarding the scope of Tiedemann's invocation, Justice Wilkins concludes, albeit based on his view that Tiedemann's invocation was ambiguous, that "the officers properly continued questioning." *Id.* The better conclusion, in my view, is that the officers should have respected Tiedemann's invocation and ceased their interrogation when their attempts to clarify the scope of the invocation were unsuccessful.

¶ 27 With respect to the pauses following questions posed by the officers during the interrogation as described by Justice Wilkins, I agree that the "officers allowed ample time for Mr. Tiedemann to respond" and that he "failed to do so." *Infra* ¶ 63. In my view, however, Tiedemann's failure to respond underscored his unambiguous invocation of his right to remain silent.

¶ 28 I also wish to comment on the majority's interpretation of the word "it" in Tiedemann's statement "I don't want to talk about it." As amply illustrated by the fact that there are three separate opinions on this particular issue, I think this court's ability to accurately determine the meaning of the pronoun "it" is limited. In addition, I believe that the majority's instruction to the district court to retroactively apply its interpretation through a systematic question-by-question parsing of the interrogation transcript will be difficult and confusing.[5]

¶ 29 Following Tiedemann's invocation of his right to remain silent and before the officers continued their interrogation, the officers should have clarified what, if anything, Tiedemann was willing to talk about. Having failed to do so, the officers were not, in my view, entitled to continue their interrogation. Because I conclude that Tiedemann was denied the opportunity to clarify the scope of his unequivocal invocation of his *Miranda* rights, I also conclude that all of Tiedemann's interrogation subsequent to his statement "I don't want to talk about it"

should be suppressed, and therefore dissent from the opinion of Justice Durrant for the majority of the court on this question.

## II.  DESTRUCTION OF EVIDENCE

¶ 30 Tiedemann argues that the State's destruction of evidence is a violation of Federal Due Process under the Fifth Amendment because the evidence may have been exculpatory, no comparable evidence still exists, and the destruction was done in bad faith. Tiedemann therefore asks that the trial court ruling be reversed and the charges dismissed.

¶ 31 In the alternative, Tiedemann asks this court to look to article I, section 7 of the Utah Constitution and adopt an analysis that considers several factors, including the State's culpability in destroying the evidence, the significance of the evidence destroyed, and the prejudice of the destruction to the defendant.

### A.  State Constitutional Standard

¶ 32 Tiedemann's brief in this matter clearly raises and extensively briefs state law claims. The State argues that Tiedemann failed to preserve his state law arguments before the trial court. The State further contends:

> This Court should also decline to address defendant's state constitutional claim because he has not adequately developed it using "historical and textual evidence, sister state law, and policy arguments in the form of economic and sociological materials to assist [the Court] in arriving at a proper interpretation of the provision in question." *Society of Separationists, Inc. v. Whitehead,* 870 P.2d 916, 921 n. 6 (Utah 1993). While defendant does cite to sister state law, he fails to analyze his claim within "the unique context in which Utah's constitution developed." Indeed, he does not even mention that the language of the

5.  For example, the majority opinion would admit Tiedemann's answer to the question "Why did you shoot them?" found on page 3 of the transcript, because the question "did not reference a particular victim." *Infra* ¶ 56. However, the same question, when asked on page 34 of the transcript would not be admitted because it be-

comes clear from Tiedemann's answer, "I don't know," and the very next question, "Why did you shoot Scotty and Chuck then?" that the officers were referencing all three of the victims in the prior question. I question the wisdom of requiring the trial court to undertake this sort of linguistic interpretation.

federal and state due process clauses are identical or explain why, given that circumstance, the clauses should be interpreted differently.

(first alteration in original) (quoting *State v. Bobo*, 803 P.2d 1268, 1272 n. 5 (Utah Ct.App. 1990)). We have quoted the State's argument at length because we wish to address what we view as a fundamental misconception of the logic of and proper approach to state constitutional law development.

¶ 33 First, the preservation argument is clearly inapplicable here. The State concedes in its brief that Tiedemann did in fact request that the trial court decide the question as a matter of state law, and the trial court's memorandum decision indicates as much. Second, the State's position that the analysis of federal constitutional provisions constitutes the default interpretive stance of this court vis-a-vis state law is not correct. The fact that the state and federal constitutional language is identical does not require a claimant to create some threshold for independent analysis of the state language. This court, not the United States Supreme Court, has the authority and obligation to interpret Utah's constitutional guarantees, including the scope of due process, and we owe federal law no more deference in that regard than we do sister state interpretation of identical state language. *See, e.g., State v. DeBooy*, 2000 UT 32, ¶ 12, 996 P.2d 546 (recognizing that article I, section 14 of the Utah Constitution and the Fourth Amendment contain identical language, but stating that the court "will not hesitate to give the Utah Constitution a different construction where doing so will more appropriately protect the rights of this state's citizens"). Furthermore, it is part of the inherent logic of federalism that state law be interpreted independently and *prior to* consideration of federal questions. Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights*, 9 U. Balt L.Rev. 379, 383–84 (1980); *see also West v. Thomson Newspapers*, 872 P.2d 999, 1006 (Utah 1994) ("By looking first to state constitutional principles, we also act in accordance with the original purpose of the federal system."). This is so because the State cannot, conceptually, deny rights guaranteed by the federal

constitution if the state action complained of is unlawful as a matter of *state* law. Thus, if state statutes, rules, or constitutional principles preclude the state action in question, there is no need to assess the federal constitutionality of that action. *See* Linde, *supra* at 383. This analytical approach is known as the "primacy model," *West*, 872 P.2d at 1005–07, and we have endorsed it in a number of cases, *see, e.g., id.* at 1006–07, 1020–21 (adopting the primacy model in the defamation context); *State v. Ramirez*, 817 P.2d 774, 781–84 (Utah 1991) (addressing defendant's claim under article I, section 7 of the Utah Constitution before proceeding to his claims under the Fourteenth Amendment to the United States Constitution); *Amax Magnesium Corp. v. Tax Comm'n*, 796 P.2d 1256, 1261 (Utah 1990) ("[I]f the challenged statute cannot withstand attack under the state constitution, there is no reason to reach the federal question."). We have, however, historically relied on other approaches, usually because of the way in which such issues have been framed by the parties. *See, e.g., State v. Larocco*, 794 P.2d 460, 464–65, 471 (Utah 1990) (plurality opinion) (conducting a federal constitutional analysis of the defendant's unlawful search claim before conducting a state constitutional analysis, and concluding that the search was reasonable under the federal constitution but not under the state constitution).

¶ 34 Federal constitutional discourse and vocabulary have dominated constitutional criminal procedure cases for so long that it continues to be difficult for lawyers to shift their perspectives in state cases. A recent example of such difficulties in Utah was commented on by Justice Stevens in his separate opinion in *Brigham City v. Stuart*, —— U.S. ——, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)(Stevens, J., concurring). That case was on appeal from this court's review of a search and seizure question in *Brigham City v. Stuart*, 2005 UT 13, 122 P.3d 506, *rev'd*, —— U.S. ——, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). In our opinion, we noted the line of Utah cases in which we have concluded that Utah's search and seizure provisions (which are identical to those in the federal constitution) provide "a greater ex-

pectation of privacy than the Fourth Amendment as interpreted by the United States Supreme Court." *Id.* ¶¶ 10–11. We criticized the failure of the appellant to raise and argue the state claims, and observed: "Where the parties do not raise or adequately brief state constitutional issues, our holdings become inevitably contingent." *Id.* ¶ 12.

¶ 35 The United States Supreme Court granted certiorari "in light of differences among state courts and the federal courts of appeals concerning the appropriate Fourth Amendment standard governing warrantless entry by law enforcement in an emergency situation." *Brigham City*, 126 S.Ct. at 1947. In his separate opinion, Justice Stevens addressed what he viewed as the futility of the Court's exercise in granting certiorari and resolving the federal question:

> Our holding today addresses only the limitations placed by the Federal Constitution on the search at issue; we have no authority to decide whether the police in this case violated the Utah Constitution.
>
> The Utah Supreme Court, however, has made clear that the Utah Constitution provides greater protection to the privacy of the home than does the Fourth Amendment. And it complained in this case of respondents' failure to raise or adequately brief a state constitutional challenge, thus preventing the state courts from deciding the case on anything other than Fourth Amendment grounds.... The fact that this admonishment and request came from the Utah Supreme Court in this very case not only *demonstrates that the prosecution selected the wrong case for establishing the rule it wants, but indicates that the Utah Supreme Court would probably adopt the same rule as a matter of state constitutional law that we reject today under the Federal Constitution.*

*Id.* at 1950 (Stevens, J., concurring) (emphasis added) (internal citations omitted).

¶ 36 The State's resistance to this court's treatment of the state constitutional issues raised in this case reflects the same short-sightedness described by Justice Stevens in *Brigham City*. The federal law on this question will serve only as a contingent rule in Utah until this court has settled the primary question of state law, and all parties, including the State, are well-advised to assist this court in its obligations to interpret that law.

¶ 37 Furthermore, we reject the State's suggestion in its brief that there is a formula of some kind for adequate framing and briefing of state constitutional issues before district courts and this court.[6] We have on numerous occasions cited with favor the traditional methods of constitutional analysis. *See, e.g., State v. Gardner*, 947 P.2d 630, 633 (Utah 1997) ("In interpreting the state constitution, we look primarily to the language of the constitution itself but may also look to 'historical and textual evidence, sister state law, and policy arguments in the form of economic and sociological materials to assist us in arriving at a proper interpretation of the provision in question.'" (quoting *Soc'y of Separationists v. Whitehead*, 870 P.2d 916, 921 n. 6 (Utah 1993))). We have also frequently noted that mere mention of state provisions will not suffice. We disagree, however, with the trial court's suggestion in its Memorandum Decision that Tiedemman's failure to offer analysis of the "unique context in which Utah's Constitution developed [or to show] why this State's Constitution should be interpreted differently than the Fifth and Fourteenth Amendments of the United States Constitution" precluded treatment of the state claim. Historical arguments may be persuasive in some cases, but they do not represent a *sine qua non* in constitutional analysis. Further, we do not require some showing that federal analysis is flawed in order to undertake independent state interpretation, although we have occa-

---

6. We likewise reject the court of appeals' suggestion in *State v. Bobo*, 803 P.2d 1268 (Utah Ct. App.1990), that an attorney must follow a set formula in order to adequately brief a state constitutional issue. *Id.* at 1273 n. 5 (instructing attorneys wishing to raise state constitutional issues in their briefs to (1) analyze "the unique context in which Utah's constitution developed"; (2) "demonstrate that state appellate courts regularly interpret even textually similar state constitutional provisions in a manner different from federal interpretations of the United States Constitution"; and (3) cite "authority from other states supporting the particular construction urged by counsel").

sionally used such arguments to bolster our conclusions. *See, e.g., Larocco,* 794 P.2d at 467–70 (plurality opinion) (recognizing "significant confusion" in federal search and seizure law and taking the opportunity to simplify search and seizure rules under the Utah Constitution by interpreting article I, section 14 to provide greater privacy protections with regard to automobile searches than the federal constitution); *State v. Watts,* 750 P.2d 1219, 1221 n. 8 (Utah 1988) ("[C]hoosing to give the Utah Constitution a somewhat different construction [than the federal constitution] may prove to be an appropriate method for insulating the state's citizens from the vagaries of inconsistent interpretations given to the fourth amendment by the federal courts."). In theory, a claimant could rely on nothing more than plain language to make an argument for a construction of a Utah provision that would be different from the interpretation the federal courts have given similar language. Independent analysis must begin with the constitutional text and rely on whatever assistance legitimate sources may provide in the interpretive process. There is no presumption that federal construction of similar language is correct.

¶ 38 In this case, Tiedemann clearly raised the state constitutional question and submitted arguments, albeit ones the trial court found unpersuasive, below. Likewise, in his brief on appeal, Tiedemann has devoted a separate section of his brief to the issue of state due process requirements in the context of destruction of evidence by the State. He has cited Utah due process cases and decisions from other state courts construing their due process requirements, including a number of states that have rejected the reasoning of the United States Supreme Court in interpreting federal law. Given our call in *Brigham City* for litigants to participate in the development of state constitutional principles, we should not decline to treat the claims properly raised here.

### B. State Due Process and Destroyed Evidence

■ ¶ 39 The question before us is whether a defendant must show bad faith on the part of the State in the loss or destruction of evidence before he may seek a remedy under state law.

¶ 40 It is a matter of clear Utah law that criminal defendants are entitled to information possessed by the State to aid in their defense. Rule 16 of the Utah Rules of Criminal Procedure imposes broad obligations on prosecutors to produce such information or make it available to a defendant. Utah R.Crim. P. 16. We have on numerous occasions enforced its requirements, and we noted in *State v. Knight:*

> The prosecutor's good faith should not have had any impact on the trial court's determination of whether the prosecutor had violated his discovery duties.... [T]he prosecutor's good faith ignorance does not excuse non-disclosure. If any weight were given to good faith ignorance, it would only encourage after-the-fact justifications for nondisclosure.

734 P.2d 913, 918 n. 5 (Utah 1987).

¶ 41 We have identified several factors under rule 16 to guide a trial court's decision on a motion to exclude prosecution evidence because of a failure to fully disclose. *State v. Kallin,* 877 P.2d 138, 143 (Utah 1994). These factors are also relevant to a motion, like the one here, to dismiss charges for destruction of evidence. The nonexclusive factors we consider under rule 16 are

> (1) the extent to which the prosecution's representation [of the existing evidence] is actually inaccurate, (2) the tendency of the omission or misstatement to lead defense counsel into tactics or strategy that could prejudice the outcome, (3) the culpability of the prosecutor in omitting pertinent information or misstating the facts, and (4) the extent to which appropriate defense investigation would have discovered the omitted or misstated evidence.

*Id.* Our approach under rule 16 should govern the destruction of evidence, and the culpability or bad faith of the state should be only one consideration, not a bright line test, as a matter of due process under article 1, section 7 of the Utah Constitution.

¶ 42 Justice Stevens' separate concurrence in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), argued

that "there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." *Id.* at 61, 109 S.Ct. 333. We agree with this assessment. Many states that have explored this question under their state due process guarantees have also agreed. *See, e.g., Thorne v. Dep't of Pub. Safety,* 774 P.2d 1326, 1331 (Alaska 1989) (construing the due process clause of the Alaska Constitution to not require a showing of bad faith); *State v. Morales,* 232 Conn. 707, 657 A.2d 585, 594–95 (1995) (concluding that the state due process clause does not have the same meaning as the federal due process clause and that it requires a balancing of the materiality of missing evidence, the reasons for its unavailability, the likelihood of mistake by witnesses or juries, and the prejudice to the defendant); *Hammond v. State,* 569 A.2d 81, 87 (Del.1989) (noting that rules regarding preservation of evidence are generally matters of state law and reaffirming prior test for balancing degree of negligence or bad faith, importance of missing evidence, and sufficiency of other evidence in support of conviction); *State v. Matafeo,* 71 Haw. 183, 787 P.2d 671, 673 (1990) (recognizing that due process inquiry must go beyond *Youngblood* because, in some cases, the state may destroy evidence, in good or bad faith, that is so critical to the defense that it makes the rule unfair); *Commonwealth v. Henderson,* 411 Mass. 309, 582 N.E.2d 496, 496–97 (1991) (holding that Massachusetts' due process rule

is stricter than the federal rule and requires balancing of the government's culpability, materiality of the evidence, and potential prejudice to the defendant); *State v. Ferguson,* 2 S.W.3d 912, 914 (Tenn.1999) (holding that "the due process principles of the Tennessee Constitution are broader than those enunciated in the [federal] Constitution" and "fundamental fairness ... requires that the State's failure to preserve evidence that could be favorable to the defendant be evaluated in the context of the entire record"); *State v. Delisle,* 162 Vt. 293, 648 A.2d 632, 642–43 (1994) (holding that where the defendant shows a reasonable possibility that the lost evidence would be exculpatory, state constitutional due process standards require balancing of the culpability of the government, the prejudice to a defendant, and the importance of the lost evidence); *State v. Osakalumi,* 194 W.Va. 758, 461 S.E.2d 504, 512 (1995) (holding as a matter of state constitutional law that "fundamental fairness requires [the court] to evaluate the State's failure to preserve potentially exculpatory evidence in the context of the entire record").[7]

¶ 43 In *Delisle,* for example, the Vermont Supreme Court rejected the use of the *Youngblood* test as the standard under its state constitution. *Delisle,* 648 A.2d at 643. In rejecting the federal standard, the court noted that it believed *Youngblood* was "both too broad and too narrow." *Id.* Specifically, the court stated that *Youngblood* was too broad because it required "the imposition of

---

7.  Ironically, Arizona is one of the states that has adopted a bright-line bad faith requirement as a matter of state due process. On remand from the United States Supreme Court in the *Youngblood* case, the Arizona Court of Appeals held that "the Due Process Clause of the Arizona Constitution provides greater protection than its federal counterpart." *State v. Youngblood,* 164 Ariz. 61, 790 P.2d 759, 762 (Ct.App.1989) (citation omitted). The Arizona Supreme Court disagreed. In *State v. Youngblood,* 173 Ariz. 502, 844 P.2d 1152 (1993), the court relied on prior state law, including the availability of a jury instruction permitting inferences from missing material evidence favorable to the defendant, and held that "absent bad faith on the part of the state, the failure to preserve evidentiary material which could have been subjected to tests, the results of which might have exonerated the defendant, does not constitute a denial of due pro-

cess of law under the Arizona Constitution." *Id.* at 1158.

  Other states adopting a bad faith rule as a matter of state law include California, *People v. Cooper,* 53 Cal.3d 771, 281 Cal.Rptr. 90, 809 P.2d 865, 886 (1991) (rejecting defendant's argument that the court should not, as a matter of state law, follow federal cases regarding destruction of evidence issues and instead applying *Youngblood* to defendant's claims); Kentucky, *Collins v. Commonwealth,* 951 S.W.2d 569, 572–73 (Ky.1997) (declining to reject *Youngblood* approach based on defendant's argument that the Kentucky Constitution used different wording than the federal constitution), and North Carolina, *State v. Drdak,* 330 N.C. 587, 411 S.E.2d 604, 608 (1992) (rejecting defendant's destruction of evidence claim under the North Carolina Constitution because he failed to show bad faith).

sanctions even though a defendant [did not] demonstrate[ ][any] prejudice from the lost evidence." *Id.* And it was too narrow because it "limit[ed] due process violations to only those cases in which a defendant can demonstrate bad faith, even though the negligent loss of evidence may critically prejudice a defendant." *Id.* The court therefore adopted its own test. *Id.* Under the test, if a defendant demonstrated "a reasonable possibility that the lost evidence would be exculpatory," then the court would determine the proper sanctions by balancing "(1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial." *Id.* at 642–43.

■ ¶ 44 Like the Vermont Supreme Court, we believe that the federal rule adopted in *Youngblood* is "both too broad and too narrow" to serve as an adequate safeguard of the fundamental fairness required by article I, section 7 of the Utah Constitution. Thus, we conclude that some balancing of factors on a case-by-case basis is required. That balancing should embrace the basic principles we have adopted under rule 16 and the factors mentioned by other states. In cases where a defendant has shown a reasonable probability that lost or destroyed evidence would be exculpatory, we find it necessary to require consideration of the following: (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.

¶ 45 The touchstone for the balancing process is fundamental fairness. If the behavior of the State in a given case is so reprehensible as to warrant sanction, a sanction might be available even where prejudice to the defendant is slight or only speculative. If prejudice to the defendant, on the other hand, is extreme, fairness may require sanction even where there is no wrongdoing on the part of the State. In between those extremes, we have confidence that trial judges can strike a balance that preserves defendants' constitutional rights without undue hardship to the prosecution.

¶ 46 In this case, Tiedemann has not shown any degree of culpability or bad faith on the part of the State, and the reasons for the loss of the evidence are entirely routine and benign: the passage of a very long period of time and the State's assumption, based on expert testimony, that Tiedemann would never become competent to stand trial. However, as to the second category of considerations, the trial court has had no opportunity to review them under the state due process clause, and neither party has briefed their application to the facts here. Thus, we remand the case to the trial court for further proceedings on these matters.

## CONCLUSION

¶ 47 Because the majority concludes that Tiedemann's responses to certain questions during his interrogation are admissible, we remand this case to the trial court to determine which responses are in that category. Furthermore, we reverse the pretrial order denying Tiedemann's motion to dismiss based on the State's destruction of potentially exculpatory evidence, and likewise remand that issue for the trial court's consideration in light of this opinion.

DURRANT, Justice, writing for the majority:

■ ¶ 48 We agree with our colleagues that Tiedemann validly waived his right to remain silent. We further agree that a defendant who wishes to invoke this right after having waived it bears the burden of clearly communicating that desire. We disagree as to whether Tiedemann met this burden. Chief Justice Durham is of the view that Tiedemann did, in fact, clearly reinvoke his right to remain silent and would therefore exclude all of his answers to questions posed after that reinvocation. Justice Wilkins is of the view that Tiedemann did not clearly reinvoke his right and would therefore exclude none of his answers. We believe the better interpretation lies in between these two views.

¶ 49 A defendant controls his right to remain silent. He may invoke it as to all matters or only as to some. He may choose to discuss some topics while eschewing others. By stating "I don't want to talk about it," Tiedemann clearly indicated a desire not to talk about something. The ambiguity lies in the pronoun "it." What did Tiedemann not want to talk about? Our reading of the transcript leads us to conclude that, at a minimum, Tiedemann did not want to talk about "what happened to Suzie." To us this much is clear. It is far from clear, however, whether he intended to assert his right to remain silent beyond this, and we believe the officers were therefore entitled to seek appropriate clarification. But in seeking that clarification, they were not entitled to direct questions specifically to "what happened to Suzie."

¶ 50 The transcript reads as follows with respect to Tiedemann's first indication that he wished to reassert in some measure his right to remain silent:

RE (Detective Ron Edwards):
    Okay, do you know why we're going to talk to you?

ET (Edgar Tiedemann):
    Ya.

RE: What are we going to talk to you about?

ET: The murders out there.

RE: What murders?

ET: The murders out there at West Valley.

RE: Who are they?

ET: Suzie, Chuck and Scotty.

RE: Whose Suzie?

ET: She's the woman I love.

RE: That you love?

ET: Ya.

RE: What happened to her?

ET: I don't want to talk about it.

¶ 51 The obvious candidate for the antecedent of the pronoun "it" in "I don't want to talk about it" is the immediately preceding question: "What happened to her?" Thus,

Tiedemann effectively stated: "I don't want to talk about what happened to Suzie." We believe this to be the fairest interpretation of Tiedemann's statement. But theoretically the antecedent of "it" may have been "The murders out there at West Valley," making Tiedemann's statement the equivalent of "I don't want to talk about the murders out there at West Valley."

¶ 52 Given this ambiguity as to the scope of Tiedemann's reinvocation of his right to remain silent, we believe the police officers were entitled to seek clarification. And we think the manner in which they did so was perfectly appropriate. Sergeant Spann first asked, "What don't you want to talk about?" [8] In response, Tiedemann stated, "I love that woman so much." Sergeant Spann again asked, "What is it that you don't want to talk about? You said murders in West Valley, where in West Valley?" A discussion then followed regarding Tiedemann's address and the fact that "Suzie and Scotty and they just moved in last night." Detective Edwards then again asked, "Okay, what don't you want to talk about? Edgar? What don't you want to talk about, Ed?" After waiting for a reply for close to ten seconds, Sergeant Spann stated as follows:

> Edgar, we're not going to force you [to] talk about anything. We're asking you questions. As Detective Edwards stated, you can answer[ ] this question[ ], not answer that question, answer this question, not answer that question. You don't have to answer any of our questions at all. You can stop at anytime.

To this Tiedemann replied, "Okay." Sergeant Spann added, "He made that clear to you, right?" Tiedemann responded, "Ya."

¶ 53 As we view the videotape, Tiedemann was not denied the opportunity to clarify the scope of his reinvocation of the right to remain silent; rather, the officers gave him multiple opportunities to clarify the scope of his reinvocation. Further, the officers emphasized to Tiedemann that he controlled his right, that he could "answer this question,

---

8. A review of the videotape reveals that this was the actual question, not the question indicated in the transcript.

not answer that question." The officers were not deceptive, abusive, or intimidating. Nor did they cut off Tiedemann's opportunity to clarify his reinvocation of his right to remain silent. Despite this opportunity, at this point in the interrogation, Tiedemann had unambiguously asserted his right to remain silent only as to Suzie, but not as to the other victims. Therefore, while the officers were precluded from asking about Suzie, they were free to ask about the other victims.

¶ 54 Accordingly, we believe that Detective Edwards was justified in posing the question "Okay, we were called to your home on a gunshot. We got in there and seen some people. Who shot them?" Tiedemann could have answered the question without reference to Suzie, and the officers were entitled to ask about the other victims. Tiedemann stated, "Me," to which Detective Edwards responded, "You did?" Tiedemann replied, "Ya." Detective Edwards then asked, "Why did you shoot them?" Again, Tiedemann could have answered the question without reference to Suzie, and the officers were entitled to ask about the other victims. Instead Tiedemann volunteered, "I shot Suzie cause I love her and I shot the other two."

¶ 55 The interrogation then proceeded, and the officers asked questions specifically about Chuck and Debra. They then asked another question that did not reference a particular victim: "Okay, why? Why did you shoot them?" Tiedemann again volunteered information about Suzie: "I shot Suzie cause I love her, I love her so much." At this point in the interrogation, Detective Edwards asked Tiedemann two questions specifically about Suzie. Further, at various points in the questioning that followed, the officers asked Tiedemann questions specifically about Suzie. We would exclude all of Tiedemann's responses to such questions. But we would allow Tiedemann's responses to all questions that were not specifically about Suzie and could have been answered as to the other victims without reference to Suzie.

¶ 56 We agree with all other aspects of the majority opinion.

¶ 57 Justice PARRISH and Justice NEHRING concur in Justice DURRANT'S opinion.

WILKINS, Associate Chief Justice, dissenting:

¶ 58 I respectfully dissent. Once Mr. Tiedemann effectively waived his right to remain silent, he was subject to police interrogation until he unequivocally reinvoked that right. Careful review of the record, including the video recording of the critical portion of the interrogation, makes only one thing clear: Mr. Tiedemann was not unequivocal in any attempt he may have made to reinvoke his right to silence. As a consequence, his statements to the police interrogators after voluntarily waiving his rights against self-incrimination may properly be admitted in any trial relating to his multiple murder, attempted murder, aggravated assault, and rape charges.

¶ 59 All agree that Mr. Tiedemann voluntarily and effectively waived his right to remain silent when initially informed of his right to do so. After carefully reconfirming the waiver and Mr. Tiedemann's understanding of the waiver at the beginning of the video recording of the interrogation, the officers ask him what happened. Mr. Tiedemann answers a number of questions, including some referring to one of the murder victims, Suzie. When the officer asks what happened to Suzie, Mr. Tiedemann says he does not "want to talk about it."

¶ 60 The confusion, if any, arises from Mr. Tiedemann's response. It is clear from review of the interrogation video that the officers were careful to inquire as to what Tiedemann did, and did not, want to talk about. Mr. Tiedemann failed to clarify his ambiguous statements, and the officers properly continued questioning. Once Mr. Tiedemann was asked to clarify the meaning of his "I don't want to talk about it" statement, the officers were under no obligation to probe further when the defendant failed to offer any clarification. Once he waived his right to remain silent, Mr. Tiedemann assumed the duty to clearly and unequivocally reinvoke that right if that was his intention. An ambiguous statement followed by non-responsive replies to questions about what he does

not want to talk about does not shift the burden back to the state to figure it out.

¶ 61 In addition, when the video of the interrogation is viewed, it becomes clear that the officers acted properly and gave ample time for Mr. Tiedemann to respond to questioning. The transcript records the questioning as follows: "Okay, what don't you want to talk about? Edgar? What don't you want to talk about, Ed? Edgar, we're not going to force you to talk about anything...." What the transcript fails to illustrate is the pauses between each question to allow time to answer. Because Mr. Tiedemann did not respond to any of the questions, the transcript shows one question after another. It could appear that the officers were barraging Mr. Tiedemann with questions, and that Mr. Tiedemann had no time to process, yet alone answer, the questions.

¶ 62 The unedited video, on the other hand, shows that the officers allowed ample time for Mr. Tiedemann to respond; he simply failed to do so. The officers paused between each question, sometimes for up to ten seconds, to allow him to respond. Mr. Tiedemann failed to clarify his equivocal statement.

¶ 63 As we have said before, "if the suspect is not reasonably clear in his [attempt to stop questioning after waiving his rights], officers are not required to stop questioning or focus on clarifying the suspect's statement." *State v. Leyva,* 951 P.2d 738, 742 (Utah 1997). The officers, in the case of Mr. Tiedemann, went beyond what our law requires. When faced with the ambiguous statement, the officers gave Mr. Tiedemann ample opportunity to clearly reinvoke his right to remain silent. Not only did he fail to clarify his intent, he listened to the officers explain again that he could stop answering at any time and that they would not force him to answer any question. Given this reemphasis and patient inquiry by the officers, however, he failed to clear the ambiguity, and, in fact, continued to answer questions about the murders and other crimes.

¶ 64 The law places a "heavy burden" on the state to initially establish a suspect's knowing and voluntary waiver of the constitutional right to remain silent in the face of police interrogation, and rightly so. *Id.* at 743. However, once a suspect has voluntarily and knowingly waived that right, any attempt to reinvoke the right shifts the burden, and the requirement of clarity, to the suspect. *Id.* In other words, the law only requires the state to prove the right was lawfully waived. He who claims to reinvoke the right thereafter must prove that it was done with sufficient clarity as to make it unambiguous. A statement, taken in context, that a suspect doesn't want to talk about "it," without more, is insufficient to shift the burden back to the state. A careful post-hoc parsing of the phrasing and language by a reviewing court may be helpful, but it would impose an unattainable burden on law enforcement, and likely result in the need to treat any suggestion as a "clear" re-invocation of the right waived. Such a result is neither required, nor useful.

¶ 65 In the parallel circumstance of a suspect first waiving and then making an ambiguous request for counsel, we reached the same conclusion. Relying on reasoning from both our prior decision in *Leyva,* and the United States Supreme Court's decision in *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), we observed that

> the requirement ... that an officer limit his questioning to clarifying a suspect's ambiguous or equivocal invocation of the right to counsel must be limited to pre-waiver scenarios.... [A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. In other words, police do not need to limit their questioning to clarifying questions when a suspect who has previously waived his *Miranda* rights makes an ambiguous request for counsel. Furthermore, we see no reason why this same rule should be different for ambiguous assertions of the right to remain silent. Therefore, because it is undisputed that [the defendant] voluntarily waived his *Miranda* rights, the detectives were free to question him until and unless he unambiguously reinvoked either his

right to counsel or his right to remain silent.

*State v. Galli,* 967 P.2d 930, 935 n. 4 (Utah 1998) (citations and internal quotations omitted).

¶ 66 In the case before us, the officers were unable to determine from his statement whether Mr. Tiedemann wished to reinvoke his right to remain silent. Due to the equivocal nature of Mr. Tiedemann's statement, and despite being under no obligation to do so, the officers made reasonable attempts to understand what he meant. They asked, "What don't you want to talk about?" After allowing ample time for Mr. Tiedemann to respond and clarify his statement, which he did not do, the officers continued with questioning, and Tiedemann confessed to the murders. The officers were well within the bounds of constitutional behavior in doing so.

¶ 67 The trial court agreed that Mr. Tiedemann's reinvocation of the right to remain silent, if that was what it was intended to be, was ambiguous. My colleagues concede that the "scope of Tiedemann's invocation" was ambiguous. I do not read the record or view the video recording of the event to reveal anything other than that Mr. Tiedemann's statement was ambiguous, at most. One could very easily conclude that the statement was more of an expression of remorse and pain than one of reinvoked rights.

¶ 68 Ultimately, Mr. Tiedemann knowingly and voluntarily waived his right to remain silent. The heavy burden that rests upon the state to establish a valid waiver in the first place shifts thereafter to the defendant to prove a reinvocation of the waived right. Once he waived his right to silence, this burden shifted to Mr. Tiedemann. He failed to unequivocally reinvoke his right, and his confession is properly subject to admission.

¶ 69 I would affirm the decision of the trial court that the defendant failed to adequately reinvoke his right to remain silent.

¶ 70 Moreover, given my analysis of the admissibility of Mr. Tiedemann's confessions to the various crimes with which he is charged, I see no possibility, as a matter of law, of any prejudice arising from the State's destruction of any of the evidence over the years. Consequently, I would affirm the decision of the trial court on that matter as well.

¶ 71 I would affirm.