*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 22**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

LISSETTE MARIAN DEJESUS,
*Appellant.*

No. 20150460
Filed April 21, 2017

On Direct Appeal

Third District, West Jordan
The Honorable Bruce C. Lubeck
No. 141400093

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard,
Asst. Solic. Gen., Salt Lake City, for appellee

Joan C. Watt, Wesley J. Howard, Alexandra S. McCallum,
Salt Lake City, for appellant

CHIEF JUSTICE DURRANT authored the opinion of the Court in which
JUSTICE DURHAM and JUSTICE HIMONAS joined.

ASSOCIATE CHIEF JUSTICE LEE filed a concurring opinion, in which
JUSTICE PEARCE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1   This case, along with *State v. Mohamud*,[1] requires us to apply the due process analysis we set forth in *State v. Tiedemann*,[2] which

---

[1] 2017 UT 23, --- P.3d ---.

addresses the due process rights of criminal defendants when evidence has been lost or destroyed. On April 23, 2015, defendant Lissette DeJesus was sentenced to an indeterminate term of zero to five years in prison for assaulting a prison guard. She argues on appeal that a video recording of the assault was lost or destroyed by the State and that this loss of evidence violated her due process rights, requiring the dismissal of her case. She also argues that the district court applied the wrong legal standard to her claim by imposing a threshold requirement that she demonstrate a reasonable probability the evidence would have been exculpatory.

¶ 2   We reaffirm today that the due process analysis set forth in *Tiedemann* does encompass a threshold reasonable probability requirement. Although the district court correctly recognized this threshold requirement, it erred by imposing on Ms. DeJesus an overly stringent interpretation of what constitutes a "reasonable probability" and concluding that she had failed to satisfy the threshold requirement. We also conclude that the court erred in its application of the factors set forth in *Tiedemann*, and upon our review of Ms. DeJesus's circumstances, we conclude that the loss of the surveillance footage was sufficiently significant to warrant the dismissal of the State's case against her. We therefore reverse the district court's decision.

## Background

¶ 3   On September 27, 2013, Corrections Officer Ronald Hansen was escorting inmates Samantha Dash and Fatima Kahn from their scheduled recreation time back to their cells at the Utah State Prison's women's facility. Ms. Dash shared cell 416 with Ms. DeJesus. Ms. Kahn occupied cell 415, located adjacent to Ms. DeJesus's cell. When Ms. Dash and Ms. Kahn arrived at their cells, Officer Hansen directed Ms. Kahn to stand in front of her cell door. She disobeyed the officer's order, however, stopping instead in front of Ms. DeJesus's cell door. Ms. DeJesus and Ms. Kahn began arguing. Officer Hansen's partner, who controlled the cell doors from a remote location, opened both doors before Officer Hansen was prepared. With Ms. DeJesus's door unlocked, Ms. Dash said "check this out" to Officer Hansen and pulled Ms. DeJesus's cell door open.

¶ 4   After Ms. Dash opened the door, Ms. DeJesus emerged from her cell, "swung at [Ms.] Kahn," and the two engaged in "mutual

---

[2] 2007 UT 49, ¶ 44, 162 P.3d 1106.

combat." Officer Hansen pulled Ms. DeJesus off of Ms. Kahn, picked Ms. DeJesus up, and carried her back into her cell. But before he could close the cell door, Ms. DeJesus moved past him and began fighting with Ms. Kahn again. Officer Hansen quickly inserted himself between the women, pushing Ms. DeJesus to the floor. While on the floor, Ms. DeJesus kicked Officer Hansen twice—once in the abdomen and once in the thigh.

¶ 5 About thirty minutes after resolving the altercation, Officer Hansen reviewed surveillance footage that had captured the event. He then filed a written report of the incident and gave a copy of the report to his captain. His captain sent the report to the prison investigations unit, and Debbie Kemp, an investigator, came to the prison about an hour and a half after the incident. She asked if there was surveillance footage of the altercation and was told someone in the control room had viewed it. She asked to view the footage, but the officer who was staffing the control room at the time was new and apparently did not know how to replay the footage, preventing Ms. Kemp from viewing the recording. After being shown where the incident occurred and conducting interviews, she returned to the control room and asked that a permanent copy of the footage be made.

¶ 6 After requesting a copy, Ms. Kemp waited for at least 30 days to follow up. She testified that during this time, she was asked to complete "10 . . . background check investigation[s] . . . [within] three weeks." This unusually heavy workload forced Ms. Kemp to "put [many things] on the back burner." When she eventually followed up to see whether the prison had made a physical copy of the surveillance footage, she learned that no copy had been made. The captain informed her that "after 30 days, it goes off the camera." Accordingly, the footage of the incident was irretrievably lost.

¶ 7 On January 14, 2014, the State charged Ms. DeJesus with one count of assault under Utah Code section 76-5-102.5, which provides that "[a]ny prisoner who commits assault, intending to cause bodily injury, is guilty of a felony of the third degree." Thirteen days later, on January 27, 2014, defense counsel entered his appearance and filed a general discovery request.[3] Two days later, defense counsel filed a supplemental discovery request seeking a "copy of any video of the alleged incident." Approximately three months later, on

---

[3] The general discovery request sought all video recordings prepared during the investigation or prosecution of the case.

May 2, 2014, the State responded that it was "unable to provide any video of the incident as none exist[s] as per the Utah State Prison."

¶ 8  On June 17, 2014, the district court held the preliminary hearing. At that hearing, Officer Hansen testified about the alleged assault. He claimed that after he threw Ms. DeJesus to the ground, she "looked directly at [him] and then kicked [him]" "in [the] lower . . . abdomen and . . . in [the] . . . right thigh." On cross-examination, Officer Hansen testified about the location of Ms. Kahn, noting that she "was on my back, I don't know exactly where she was. . . . [S]he was no longer on my shoulder though, I could not see her behind me, she was behind me." Defense counsel emphasized this point, asking, "So she could've been as close as inches away but you couldn't see her?" Officer Hansen responded: "But I could not see her, no."

¶ 9  Following the preliminary hearing, Ms. DeJesus moved to dismiss the charge under *State v. Tiedemann*, claiming that the loss or destruction of the surveillance footage constituted a due process violation. She argued that if she kicked Officer Hansen, she did so unintentionally, merely seeking to defend herself from Ms. Kahn. During oral argument on the motion to dismiss, the district court decided it needed additional evidence and scheduled the matter for an evidentiary hearing.

¶ 10 At the evidentiary hearing, Ms. DeJesus called Ms. Dash to testify about the event. The State asked the court to instruct Ms. Dash about her right against self-incrimination, noting that "[s]he was originally charged in this case," which charge had been dismissed without prejudice. The State informed the court and Ms. Dash that, "based on her testimony today, we could refile that case." In response, Ms. Dash invoked her Fifth Amendment right against self-incrimination and refused to testify.

¶ 11 Officer Hansen also testified at the evidentiary hearing. This time, he said the surveillance footage showed that Ms. Kahn was about four to six feet behind him when he pushed Ms. DeJesus to the ground. On cross-examination, defense counsel pressed Officer Hansen about the testimony he gave at the preliminary hearing that Ms. Kahn "was on his back" and he did not see where she was at the time of the assault. Officer Hansen clarified his prior testimony, noting that at the time of the altercation he did not know precisely where Ms. Kahn was standing. After viewing the surveillance footage, however, he could see that Ms. Kahn was standing four to six feet behind him.

¶ 12 Ms. DeJesus also called Ms. Ataata, who identified herself as Ms. DeJesus's fiancée, to testify. Ms. Ataata was incarcerated in an adjacent cell—417—at the time of the altercation and viewed most of the incident. She contradicted Officer Hansen's testimony, claiming that Officer Hansen, Ms. DeJesus, and Ms. Kahn "were all on the ground." She also testified that Ms. Kahn did not disengage from Officer Hansen, but remained on his back the entire time, attempting to "[s]wing" "over [Officer Hansen] to get to [Ms.] DeJesus." The district court, in its memorandum decision, noted that Ms. DeJesus was "making facial gestures and expressions of varying sorts to [Ms.] Ataata depending on what [Ms.] Ataata was saying in her testimony."

¶ 13 After the evidentiary hearing, the court determined that it needed a supplemental evidentiary hearing to receive evidence from Ms. Kemp, the investigator from the prison investigation unit. It was then that Ms. Kemp testified that she attempted to view the recording while at the control unit but could not and that the prison had not preserved a physical copy of the footage. The district court asked her whether "someone has to do anything to make [the footage] disappear," to which she responded that she did not know, but that she "wouldn't think so, no."

¶ 14 The district court subsequently issued a memorandum decision denying Ms. DeJesus's motion to dismiss. Applying *State v. Tiedemann*,[4] the court noted that Ms. DeJesus had to show, "as a threshold, whether . . . it is reasonably probable that the recording would be exculpatory." The court found that "[h]ere, defendant produced a witness, her fiancé[e] [Ms. Ataata], who said [Ms.] Khan was engaged in fighting with defendant when defendant struck [Officer] Hansen." But the court "[did] not accept as true the testimony of [Ms.] Ataata" for three reasons: (1) the relationship between Ms. Ataata and Ms. DeJesus, (2) Ms. DeJesus's signals to Ms. Ataata during her testimony, and (3) the fact that Ms. Ataata viewed the events from an angle. Reasoning that because only credible evidence can create a reasonable probability, and because "the testimony [of Ms. Ataata] was not believable," the district court held that Ms. DeJesus had not satisfied the threshold requirement under *Tiedemann*.

_____

[4] 2007 UT 49, 162 P.3d 1106.

¶ 15 Despite this conclusion, the court also considered the two factors set out in *State v. Tiedemann*,[5] reasoning that "[if] the court is wrong about the exculpatory nature of the recording, dismissal is [still] not appropriate." The court characterized the first *Tiedemann* factor as concerned with "the reason for the destruction or loss or failure of preservation of the evidence, including the degree of negligence or culpability on the part of the State." The court found that "the reasons given for the lack of preservation are believable, and amount to negligence but not in a high degree." The court also stated that "it is very difficult, if not impossible, for this court to understand why prison personnel would not, with full knowledge that a claimed assault had occurred by an inmate against a guard, maintain a recording of that event."

¶ 16 The court characterized the second *Tiedemann* factor as concerned with "the [degree] of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence." The court then reasoned that "[o]nly if the recording shows in essence what defendant claims would there be prejudice by its unavailability." Because the court did "not believe defendant [had] shown any reasonable, believable probability the recording showed what defendant claims," it concluded that "it does not matter why or how [the footage] was destroyed, or more properly not retained." Ultimately, the district court held that Ms. DeJesus's due process rights were not violated by the destroyed surveillance footage and denied the motion to dismiss.

¶ 17 Ms. DeJesus filed an interlocutory appeal with the court of appeals to review the denial of her motion to dismiss. That court denied the petition. Thereafter, she entered a conditional guilty plea to one count of assault by a prisoner, a third degree felony, reserving her right to appeal the denial of her motion to dismiss. The district court, per the prosecution's recommendation, sentenced Ms. DeJesus to serve zero to five years in prison, to run concurrently with her

---

[5] *See id.* ¶ 44 ("In cases where a defendant has shown a reasonable probability that lost or destroyed evidence would be exculpatory, we find it necessary to require consideration of the following: (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.").

other sentences. Ms. DeJesus timely appealed, and the court of appeals certified the case to us. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(b).

## Standard of Review

¶ 18 Ms. DeJesus raises two overarching issues on appeal. First, she argues that the district court incorrectly interpreted *State v. Tiedemann* to require that a defendant demonstrate a reasonable probability that the lost evidence would have been exculpatory. This question, which requires us to examine the requirements of the due process clause of the Utah Constitution, is a question of law that we review for correctness.[6] Ms. DeJesus also argues that the district court erred in its application of the *Tiedemann* due process analysis and accordingly incorrectly denied her motion to dismiss. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness," though we "incorporate a clearly erroneous standard for the necessary subsidiary factual determinations."[7]

## Analysis

¶ 19 The first issue on appeal focuses on the precise requirements of the due process test we announced in *State v. Tiedemann*.[8] The second issue focuses on that test's proper application in Ms. DeJesus's case. We begin our discussion by reviewing our decision in *Tiedemann*. We reaffirm our earlier conclusion that the due process clause of the Utah Constitution requires a defendant to first establish as a threshold matter a reasonable probability that the lost or destroyed evidence would have been exculpatory. By so doing, the defendant establishes that his or her due process rights have been violated. Once a defendant has made this threshold showing, the court must consider the two factors set forth in *Tiedemann*—the culpability of the State and the prejudice to the defendant—in order to both evaluate the seriousness of the violation and determine the necessary remedy.

¶ 20 After reviewing *Tiedemann*, we apply the due process analysis established therein to Ms. DeJesus's case. We conclude that the district court erred by imposing a higher burden at the threshold level than is required under *Tiedemann*, and that under the proper

---

[6] *See State v. Tiedemann*, 2007 UT 49, ¶ 12, 162 P.3d 1106.

[7] *Id.*

[8] 2007 UT 49, 162 P.3d 1106.

standard, Ms. DeJesus met her burden. We also conclude that the court erred in its application of the two *Tiedemann* factors and that dismissal was an appropriate remedy for the loss of the surveillance footage. Ultimately, we reverse the decision of the district court and remand for an entry of dismissal.

## I. The Due Process Clause of the Utah Constitution, as Interpreted in *State v. Tiedemann*, Requires a Threshold Showing that There Is a Reasonable Probability that the Lost or Destroyed Evidence Would Have Been Exculpatory

¶ 21 Ms. DeJesus's first argument on appeal focuses on the correct interpretation of the due process analysis we articulated in *State v. Tiedemann*.[9] She argues that the district court erroneously interpreted *Tiedemann* as establishing a threshold requirement that a defendant show a reasonable probability that lost evidence would have been exculpatory. She claims that the correct due process analysis requires district courts "to consider the [factors found in rule 16 of the Utah Rules of Criminal Procedure,] and the factors considered by other states." Then, when a defendant has shown a reasonable probability that the lost evidence would have been exculpatory, he or she must show the culpability of the State in the loss of the evidence and the degree of prejudice to the defendant resulting from the lost evidence. The State responds that our articulation of the applicable due process analysis in *Tiedemann* clearly encompassed a threshold requirement, and that such a requirement comports with other due process standards. We agree with the State.

¶ 22 As we discuss below, our decision in *Tiedemann* came after the United States Supreme Court's interpretation of the federal Due Process Clause's requirements in lost evidence cases. In *Tiedemann*, we were called on to determine whether the Utah Constitution's due process clause imposed the same requirements as its federal counterpart. We ultimately departed from the Supreme Court's approach as a matter of state due process and instead adopted an approach consonant with rule 16 of the Utah Rules of Criminal Procedure, other state courts' interpretations of their own constitutions, and other due process analyses. This approach encompassed a threshold requirement that the defendant demonstrate a reasonable probability that the lost evidence would have been exculpatory. Only after this threshold showing is met

---

[9] 2007 UT 49, 162 P.3d 1106.

8

should courts consider the factors set forth in *Tiedemann* in order to provide an appropriate remedy. Thus, Ms. DeJesus's argument that the *Tiedemann* analysis does not require a threshold showing misapprehends our precedent.

¶ 23 Prior to *Tiedemann*, the United States Supreme Court decided *Arizona v. Youngblood*,[10] holding as a matter of federal constitutional law that the "failure to preserve potentially useful evidence does not constitute a denial of due process of law" "unless a criminal defendant can show bad faith on the part of the police."[11] This "bad faith" standard confined constitutional relief "to that class of cases where the interests of justice most clearly require it," which are those cases "in which the police themselves by their [bad faith] conduct indicate that the evidence could form a basis for exonerating the defendant."[12]

¶ 24 In *Tiedemann* we were called on to decide whether the due process clause of the Utah Constitution also required "a defendant [to] show bad faith on the part of the State in the loss or destruction of evidence before he may seek a remedy."[13] To answer this question, we were guided by rule 16 of the Utah Rules of Criminal Procedure and the approaches of other states' courts. As we described in *Tiedemann*, rule 16 "imposes broad obligations on prosecutors" to produce or make available information that can aid the defendant.[14] And a prosecutor's failure to comply with rule 16's disclosure requirements permits a defendant to bring a motion to exclude the prosecution's evidence.[15] Although we recognized the "nonexclusive factors" that courts consider when ruling on such motions,[16] we reiterated that, under rule 16, "[t]he prosecutor's good

---

[10] 488 U.S. 51 (1988).

[11] *Id.* at 58.

[12] *Id.*

[13] 2007 UT 49, ¶ 39.

[14] *Id.* ¶ 40; *see also* UTAH R. CRIM. P. 16(a) (requiring prosecutors to "disclose to the defense upon request" several categories of evidence or information, including all "evidence known to the prosecutor that tends to negate the guilt of the accused, mitigate the guilt of the defendant, or mitigate the degree of the offense for reduced punishment").

[15] *See Tiedemann*, 2007 UT 49, ¶ 41.

[16] *Id.*

faith should not have . . . any impact on the trial court's determination of whether the prosecutor had violated his discovery duties."[17] We concluded that "[o]ur *approach* under rule 16 should govern the destruction of evidence."[18] Thus, we rejected *Youngblood*'s bad faith requirement, concluding instead—consonant with rule 16—that "the culpability or bad faith of the state should be only one consideration, not a bright line test, as a matter of due process under article 1, section 7 of the Utah Constitution."[19]

¶ 25 Having rejected the federal constitution's approach to lost evidence cases, we then discussed what the appropriate approach should be under the Utah Constitution. We were guided in our efforts by looking to our sister jurisdictions.[20] We found the Vermont Supreme Court's analysis, articulated in *State v. Delisle*,[21] particularly persuasive. Under the Vermont court's approach,

> if a defendant demonstrated "a reasonable possibility that the lost evidence would be exculpatory," then the court would determine the proper sanctions by balancing "(1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial."[22]

Under this approach, a defendant must first "demonstrate[] 'a reasonable possibility that the lost evidence would be exculpatory.'"[23] Once that threshold is satisfied, the court must review and weigh three factors to determine the proper remedy.

¶ 26 We adopted a substantially similar analysis:

> In cases where a defendant has shown a reasonable probability that lost or destroyed evidence would be

---

[17] *Id.* ¶ 40 (citation omitted).

[18] *Id.* ¶ 41 (emphasis added).

[19] *Id.*

[20] *See id.* ¶¶ 42–43 (citing and discussing cases).

[21] 648 A.2d 632, 642–43 (Vt. 1994) (discussed in *Tiedemann*, 2007 UT 49, ¶ 43).

[22] *Tiedemann*, 2007 UT 49, ¶ 43 (quoting *Delisle*, 648 A.2d at 642–43).

[23] *Id.* (citation omitted).

exculpatory, we find it necessary to require consideration of the following: (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.[24]

This approach encompassed the same threshold showing found in the Vermont analysis, requiring defendants to "show[] a reasonable probability that [the] lost or destroyed evidence would be exculpatory."[25] It also required a "balancing of factors on a case-by-case basis," which "embrace[d] the basic principles we ha[d] adopted under rule 16 and the factors mentioned by other states."[26]

¶ 27 So, contrary to Ms. DeJesus's argument, the due process analysis we articulated in *Tiedemann* is not a wide-ranging balancing test that encompasses all of the factors applicable to rule 16—most of which would be difficult if not impossible to directly apply to cases involving lost evidence.[27] Instead, we established a two-step analysis. First, the defendant must demonstrate a reasonable probability that the lost evidence would have been exculpatory—the

---

[24] *Id.* ¶ 44.

[25] *Id.*

[26] *Id.* This test encompasses two aspects: first, it encompasses "the basic principles" of rule 16, including the principle that "the culpability or bad faith of the state should be only one consideration" in our due process analysis. *Id.* ¶ 41. Second, it encompasses the factors adopted by other states, particularly the culpability or bad faith of the State and the prejudice to the defendant in light of the remaining evidence. *See id.* ¶ 43.

[27] *See id.* ¶ 41 (discussing the "nonexclusive factors we consider under rule 16," which include "(1) the extent to which the prosecution's representation [of the existing evidence] is actually inaccurate, (2) the tendency of the omission or misstatement to lead defense counsel into tactics or strategy that could prejudice the outcome, (3) the culpability of the prosecutor in omitting pertinent information or misstating the facts, and (4) the extent to which appropriate defense investigation would have discovered the omitted or misstated evidence" (alteration in original) (citation omitted)).

threshold requirement. Once a defendant has done so, the court must balance the culpability of the State and the prejudice to the defendant in order to gauge the seriousness of the due process violation and to determine an appropriate remedy. The purpose for this two-part analysis, with its threshold requirement, is to ensure that a defendant only obtains a remedy—and that the State is only sanctioned—when the defendant's due process rights have actually been violated. Indeed, this approach comports with the due process analysis applicable in other circumstances.

¶ 28 For example, in *Brady v. Maryland*,[28] the United States Supreme Court held that "the suppression by the prosecution of *evidence favorable to an accused* upon request violates due process where the *evidence is material to guilt or to punishment*, irrespective of the good faith or bad faith of the prosecution."[29] So, to establish a due process violation stemming from the non-disclosure of evidence, a defendant must show a "reasonable probability that [the evidence] would affect the outcome of the trial"[30]—essentially the same threshold requirement we adopted in *Tiedemann*. If the evidence that was wrongfully withheld would have had no bearing on the trial's outcome, a defendant's due process right to a fundamentally fair trial has not been violated.[31] In the same way, the destruction of evidence violates a defendant's due process rights only when there is "a reasonable probability that [the] lost or destroyed evidence [was] exculpatory."[32] Unless the evidence had some chance of affecting the outcome of the trial, a defendant cannot claim a due process violation.

¶ 29 We accordingly reject Ms. DeJesus's claim that the due process analysis set forth in *Tiedemann* for use in lost evidence cases does not require a threshold showing that there is a reasonable

---

[28] 373 U.S. 83 (1963).

[29] *Id.* at 87 (emphasis added); *see also State v. Schreuder*, 712 P.2d 264, 276 (Utah 1985) ("[A] criminal defendant will prevail on a *Brady* claim 'where the evidence is favorable to the accused and is material either to guilt or to punishment.'" (quoting *Moore v. Illinois*, 408 U.S. 786, 794 (1972))).

[30] *Schreuder*, 712 P.2d at 276.

[31] *See Tiedemann*, 2007 UT 49, ¶ 45.

[32] *Id.* ¶ 44.

probability the lost evidence would have been exculpatory.[33] Under *Tiedemann*, a defendant must show as a threshold matter that there is "a reasonable probability that [the] lost or destroyed evidence would be exculpatory."[34] Only after the defendant has established this point—and accordingly established that there was a due process violation resulting from the loss of evidence—should a court consider the two *Tiedemann* factors. And these factors—the culpability of the prosecution and the prejudice to the defendant— guide the court's analysis as to both the seriousness of the due process violation and the remedy that is necessary to rectify the violation.

¶ 30 In reaffirming our holding in *Tiedemann* that the due process clause requires the State to preserve exculpatory evidence from loss or destruction, we necessarily reject the approach advocated by the concurrence. While it agrees with the reasoning of the majority, it argues that we should "root" that reasoning and its concomitant legal principles in "our inherent power to regulate proceedings in our courts," not "the Due Process Clause of the Utah Constitution."[35] This proposed adjustment, the concurrence contends, "is a modest one,"[36] "counseled by the doctrine of constitutional avoidance"[37] with a profound "practical and theoretical significance"; it affords us "the power to refine and adjust the standard set forth in *Tiedemann*."[38]

¶ 31 The chief obstacle to this proposal is *Tiedemann* itself. As we noted above, *Tiedemann* came in response to the United States Supreme Court decision of *Arizona v. Youngblood* and its requirement that criminal defendants prove bad faith in the loss or destruction of evidence in order to secure a remedy under the federal

---

[33] We note that the court of appeals in *State v. Jackson* apparently interpreted *Tiedemann* in line with Ms. DeJesus's argument—i.e., without any threshold requirement. *See* 2010 UT App 328, ¶¶ 10, 19– 21, 243 P.3d 902. To the extent *Jackson* suggests that the relevant due process analysis does not require a defendant to meet this threshold burden, it is overruled.

[34] *Tiedemann*, 2007 UT 49, ¶ 44.

[35] *Infra* ¶ 58.

[36] *Infra* ¶ 59.

[37] *Infra* ¶ 58.

[38] *Infra* ¶ 59.

constitution.[39] In rejecting this demanding bad-faith standard, we consulted several of our sister jurisdictions that have held that the due process clauses of their state constitutions afford defendants more robust protections than the federal constitution in consequence of lost or destroyed evidence.[40] And after consulting these jurisdictions, we elected to join them, identifying the due process clause of the Utah Constitution as the source of the *Tiedemann* test.[41]

¶ 32 The concurrence rightly observes that in *Tiedemann* we relied on rule 16.[42] But the concurrence relies on this fact to recommend that we "hold that the duty and standards set forth in *Tiedemann* are a matter of inherent judicial power and enforcement of the terms of rule 16 of our rules of criminal procedure."[43] This misapprehends *Tiedemann*. In referencing rule 16, we did not ground the *Tiedemann* test in our rules of criminal procedure. We instead pointed lower courts to "[o]ur approach under rule 16" where "the culpability or bad faith of the state should only be one consideration, not a bright line test [unlike *Youngblood*], as a matter of [state] due

---

[39] *Youngblood*, 488 U.S. at 58 (holding as a matter of federal constitutional law that the "failure to preserve potentially useful evidence does not constitute a denial of due process of law" "unless a criminal defendant can show bad faith on the part of the police").

[40] *Tiedemann*, 2007 UT 49, ¶ 42 (collecting cases). Concerning the concurrence's claim that some of the authorities cited by *Tiedemann* "were tied to a large extent to the standards like that set forth in our criminal rule 16," *infra* ¶ 67, we note that we read these cases differently. While each case discussed rules of criminal procedure, each holding was ultimately based on its state's due process clause. *See, e.g.*, *State v. Delisle*, 648 A.2d 632, 642–43 (Vt. 1994) ("adopt[ing] as the state constitutional standard" a three-factor test under the state due process clause and concluding that the loss of evidence did not violate defendant's due process rights because he cross-examined a medical examiner who provided the defendant favorable testimony regarding the missing evidence); *Thorne v. Dep't of Public Safety*, 774 P.2d 1326, 1330 (Alaska 1989) (holding that the appellant's "due process rights at the revocation hearing were violated by the state's failure to preserve the videotape").

[41] *Tiedemann*, 2007 UT 49, ¶ 44.

[42] *Infra* ¶ 67.

[43] *Infra* ¶ 58.

process."[44] Rule 16, therefore, does not govern cases of lost or destroyed evidence. It merely provides a helpful framework for applying the *Tiedemann* test. Without question, we planted the *Tiedemann* test in constitutional soil.[45]

¶ 33 *Tiedemann* aside, the concurrence supports its proposal by relying on the doctrine of constitutional avoidance and on the practical benefits secured by a non-constitutional foundation for the *Tiedemann* test.[46] As to constitutional avoidance, it is well established that courts "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."[47] But the concurrence's use of this principle is novel. In essence, the concurrence contends that we should avoid procedural due process questions "properly presented by the record" because we have inherent authority to make rules of procedure. Taken to its logical extreme, this would prospectively render much procedural due process in this jurisdiction dead letter. We think this ill advised.[48]

---

[44] *Tiedemann*, 2007 UT 49, ¶ 41.

[45] The concurrence acknowledges "that *Tiedemann* purported to state a requirement of state due process" and concludes that we should "leave open the possibility that our Utah Due Process Clause may have a role to play in establishing a 'floor' or minimum standard protecting an accused whose defense is interfered with by the destruction of material evidence." *Infra* ¶ 68. But the concurrence does not attempt to identify this floor. And we can think of no more suitable floor concerning the destruction of evidence than the one we describe in *Tiedemann*—when the State loses or destroys evidence, the court will impose appropriate sanctions aimed at preserving the defendant's right to a fair trial.

[46] *Infra* ¶¶ 58–59.

[47] *Slack v. McDaniel*, 529 U.S. 473, 485 (2000) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

[48] We recognize in this case that the concurrence does not advocate the creation of a new rule but argues that rule 16 governs cases dealing with the loss or destruction of evidence. Yet encouraging courts to rely on inherent judicial powers to avoid constitutional issues will lead to the problem described above. In addition, we note that in avoiding certain constitutional issues, the concurrence would create *new* constitutional issues, as new rules rooted in our court's inherent judicial authority or in our rulemaking

(Continued)

¶ 34 As to the practical benefits secured by a non-constitutional foundation for the *Tiedemann* test, we agree with the concurrence that "[o]ur constitutional decisions are set in relative stone," in that "[t]hey place matters resolved by them beyond the policy reach of this or other branches of government, and they establish precedent that we ourselves may be bound by under the doctrine of *stare decisis*."[49] But matters resolved by our constitutional decisions often concern fundamental rights. In this case, our decision concerns Ms. DeJesus's right to a fair trial when facing the deprivation of her liberty. When matters such as this are before us, the proper interpretation and application of the constitution is rightly set in relative stone to ensure that an individual's fundamental rights are not subject to the ever changing judgments of public policy.

¶ 35 In the end, we have not, as the concurrence suggests, "distort[ed] the constitution,"[50] but have simply reaffirmed our precedent regarding the due process concerns that arise when the State is responsible for the loss or destruction of evidence that has a reasonable probability of exculpating a criminal defendant. The concurrence, by contrast, does not propose a "modest" alteration to our precedent but a monumental one. By uprooting the *Tiedemann* test from constitutional soil, the concurrence would significantly weaken a fundamental right: Whatever protections a defendant receives when faced with lost or destroyed exculpatory evidence would turn on the discretion of a particular judge in the exercise of his or her inherent judicial authority. And appellate review of that exercise would be reviewed for an abuse of discretion.[51] This would be a poor substitute for the protections, including more robust appellate review, that our interpretation of the due process clause

---

power could be subject to constitutional challenge on the ground that they provide less protection than constitutionally mandated.

[49] *Infra* ¶ 70.

[50] *Infra* ¶ 77.

[51] *See State v. Dick*, 2012 UT App 161, ¶ 2, 280 P.3d 445 ("A trial court's ruling on a rule 16 issue is reviewed for an abuse of discretion."); *see also Coroles v. State*, 2015 UT 48, ¶ 24, 349 P.3d 739 (concluding that in the civil context, a court's decision to sanction a party for its failure to comply with a discovery deadline is reviewed for an abuse of discretion).

affords criminal defendants.[52] We will not invoke the doctrine of constitutional avoidance to essentially erase this court's previous conclusion that government loss or destruction of exculpatory evidence directly implicates due process.[53]

¶ 36 The district court correctly imposed a threshold requirement that Ms. DeJesus establish a reasonable probability that the lost evidence would have been exculpatory—a requirement established under our state due process clause. We now review the district court's conclusion that Ms. DeJesus failed to meet that threshold requirement and its alternative determination that, even if she had, she was not entitled to a dismissal under the two *Tiedemann* factors.

II. The District Court Erred in Its Application of *Tiedemann*

¶ 37 The district court articulated two different bases for its denial of Ms. DeJesus's motion to dismiss, consistent with its understanding of the due process analysis set forth in *State v. Tiedemann*[54]: first, Ms. DeJesus failed to demonstrate as a threshold matter a reasonable probability that the lost footage would have been exculpatory; and second, even if she satisfied the threshold requirement, she failed to show that the *Tiedemann* factors required

---

[52] *See Tiedemann*, 2007 UT 49, ¶ 12 ("Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness.").

[53] The concurrence argues that our reasoning in this regard is circular, in that we assume the *Tiedemann* standard to be required by the Utah Constitution's due process clause. *Infra* ¶ 81. But this simply highlights our disagreement with the concurrence. The concurrence does not view the *Tiedemann* standard as having been dictated by the Utah Constitution. For the reasons explained above, we disagree. We view *Tiedemann* to have held that the standard it articulates is required by the Utah Constitution. So we would be weakening a fundamental right by avoiding the question of whether the *Tiedemann* standard is required by the Utah Constitution. If we were addressing in the first instance whether the Utah Constitution requires the *Tiedemann* standard, then it would indeed be circular to claim that we would be weakening a fundamental right if we failed to adopt that standard. But because we read *Tiedemann* as holding that the Utah Constitution does indeed require that standard, we can say that grounding the *Tiedemann* standard in a procedural rule, rather than the Utah Constitution, would weaken the right.

[54] 2007 UT 49, ¶ 44, 162 P.3d 1106.

dismissal of her case. We discuss each of these determinations below and conclude that the district court erred in its application of the due process analysis found in *Tiedemann* to the facts of the case.

*A. Ms. DeJesus Established a Reasonable Probability that the Lost Footage Would Have Been Exculpatory*

¶ 38 The first basis for the district court's denial of Ms. DeJesus's motion to dismiss was that she had failed to establish as a threshold matter that there was a reasonable probability the lost surveillance footage would have been exculpatory. In reviewing the district court's decision on this matter, we reiterate that we accept its factual determinations unless clearly erroneous.[55] But the district court's determination of what constitutes a reasonable probability for purposes of the *Tiedemann* analysis is a legal question reviewed for correctness.[56] So, though we defer to the court's conclusions as to the facts of Ms. DeJesus's case, we owe no deference to its determination that those facts fail to satisfy her threshold burden under *Tiedemann*.

¶ 39 Of course, in order to analyze whether Ms. DeJesus established a reasonable probability that the lost evidence would have been exculpatory, we must first determine what constitutes a reasonable probability for purposes of a defendant's due process right to exculpatory evidence. Although a "reasonable probability" standard defies a precise definition or quantifiable value, we have described it as "a probability sufficient to undermine confidence in the outcome."[57] And though it is more than a "mere possibility," it

---

[55] *See id.* ¶ 12.

[56] *See id.*

[57] *State v. Knight*, 734 P.2d 913, 920 (Utah 1987) (citation omitted). The parties have argued at some length over whether a "reasonable probability" is a different standard than a "reasonable *possibility*" or a "reasonable *likelihood*"—standards that have been employed by other courts. *See, e.g., State v. Delisle*, 648 A.2d 632, 642 (Vt. 1994) (employing a "reasonable possibility" standard to a due process claim founded on lost or destroyed evidence). But we see little substantive difference between any of these articulations. *See Knight*, 734 P.2d at 920 (stating that a "reasonable probability" is "substantively identical" to a "reasonable likelihood"). Thus, though we use the phrase "reasonable probability" to maintain consistency with *Tiedemann*, we believe that the distinctions between these various articulations—if any exist—are of no practical effect.

falls "substantially short of the 'more probable than not'" standard.[58] Ultimately, in order to satisfy the reasonable probability standard in the lost evidence context, a defendant must make some proffer as to the lost evidence and its claimed benefit.[59] So long as that proffer is not pure speculation or wholly incredible, the standard will be satisfied.[60]

¶ 40 Our review of the district court's determination that Ms. DeJesus failed to satisfy the threshold reasonable probability requirement leads us to conclude that the court applied a more stringent standard than the one we just articulated. The court stated that "[t]here must be something in the evidence before the court . . . that shows the court there is some reasonable basis on which to believe the recording would show what defendant claims." This standard suggests that defendants must provide evidence that the lost or destroyed evidence was in fact exculpatory. This is too high of a burden given both the reasonable probability standard articulated in *Tiedemann* and the fact that, in many lost evidence cases, there may be little extrinsic, corroborating evidence. Defendants will likely never be able to fully establish exactly what the evidence would have shown. Instead, all a defendant must show is that there is a reasonable probability the evidence would have been exculpatory.

¶ 41 Applying the correct standard, we conclude that Ms. DeJesus established a reasonable probability that the lost footage would have been exculpatory. She presented the testimony of her fiancée, Ms. Ataata, who testified that Officer Hansen, Ms. DeJesus, and Ms. Kahn "were all on the ground" during the altercation, and that Ms. Kahn "was right there on [Officer Hansen's] back the whole time," attempting to "[s]wing . . . over him to get to [Ms.] DeJesus."

---

[58] *Knight*, 734 P.2d at 920.

[59] *Cf. State v. Nielsen*, 727 P.2d 188, 193 (Utah 1986) (holding that in order to establish a due process violation resulting from the prosecution's refusal to disclose the identity of a confidential informant, "a defendant must make *some showing* that disclosure of an informant's identity is material and essential to his defense" (emphasis added)).

[60] *Cf. State v. Mohamud*, 2017 UT 23, ¶¶ 24, 26, --- P.3d --- (holding that a defendant failed to satisfy the reasonable probability standard when he provided only speculation as to what the lost evidence would have shown).

Because the crime with which Ms. DeJesus had been charged—assault—requires the prosecution to prove "inten[t] to cause bodily injury,"[61] Ms. Ataata's testimony suggests that Ms. DeJesus may not have intended to cause bodily injury to Officer Hansen, but was instead attempting to strike Ms. Kahn.

¶ 42 The district court found Ms. Ataata's testimony "not believable" based on the close relationship between Ms. Ataata and Ms. DeJesus, its finding that Ms. DeJesus appeared to be coaching Ms. Ataata's testimony, and the fact that Ms. Ataata's view of the incident was partially obstructed, as she was viewing it at an angle. "The court thus d[id] not accept her testimony at face value as being testimony the court can rely on to find the events were as she described." But the court specifically found that the testimony was not wholly incredible, stating that it was "not indicating such evidence cannot be presented by defendant at a trial" and that "[a] jury may well conclude differently."

¶ 43 Ms. DeJesus also argues that the testimony of Ms. Ataata is strengthened by the arguably inconsistent testimony offered by Officer Hansen. During the preliminary hearing, the officer testified that Ms. Kahn "was on my back, I don't know exactly where she was. . . . [S]he was no longer on my shoulder though, I could not see her behind me, she was behind me," and seemed to agree with defense counsel's statement that "she could've been as close as inches away but you couldn't see her?" But during the evidentiary hearing on Ms. DeJesus's motion to dismiss, he testified that Ms. Kahn was about four to six feet behind him when he pushed Ms. DeJesus to the ground. Officer Hansen explained this discrepancy by stating that his initial testimony went to what he knew of Ms. Kahn's location during the altercation, but his later testimony was based on his review of the surveillance footage, which clarified where Ms. Kahn actually was standing.

¶ 44 We agree with Ms. DeJesus that this evidence—the testimony of Ms. Ataata and the arguably inconsistent testimony of Officer Hansen—is sufficient to establish a reasonable probability that the lost surveillance footage would have been exculpatory. The evidence put on by Ms. DeJesus was not wholly incredible, and it established that her claim that she did not intend to attack Officer Hansen, but rather was attempting to strike Ms. Kahn, was more than speculation. We emphasize that we do not suggest that

---

[61] UTAH CODE § 76-5-102.5.

Ms. DeJesus has actually established what the lost evidence would have shown; we simply hold that the testimony of Ms. Ataata, when combined with the arguably inconsistent testimony of Officer Hansen, crosses the low threshold of "reasonable probability."[62] Together, this testimony provides a reasonably probable explanation of both what the lost evidence might have shown and how that evidence could have benefitted Ms. DeJesus. Accordingly, we hold that the district court erred by imposing too stringent a standard on Ms. DeJesus at the threshold inquiry, and that, under the proper "reasonable probability" standard described above, Ms. DeJesus satisfied her threshold burden.[63] We turn now to the district court's application of the two *Tiedemann* factors.

## B. The Tiedemann *Factors Weigh in Favor of Dismissal*

¶ 45 As discussed above, once "a defendant has shown a reasonable probability that lost or destroyed evidence would be exculpatory," the defendant has established that a due process

---

[62] The State argues that "all credible evidence . . . demonstrated that the lost footage would not have been favorable to the defense but instead would have conclusively proven the State's case." But it is usually inappropriate to permit the State to undermine a defendant's claim that there is a reasonable probability that lost evidence would have been exculpatory by having the State describe what the evidence actually showed. The reasonable probability threshold inquiry does not involve a balancing of evidence to determine which side's story about the lost evidence is more believable and whether the evidence was in reality inculpatory or exculpatory; it focuses entirely and solely on whether the defendant can show a *reasonable probability* that the evidence would have been exculpatory. If we were to hold otherwise, the State would be incentivized to destroy relevant evidence and later claim that the evidence would have only supported its own version of the events. It is the State's duty to preserve relevant evidence, and it cannot escape that duty—or the consequences of its breach of that duty—simply by putting on evidence as to what the lost evidence would have shown.

[63] By concluding that the district court applied an incorrect standard, we do not wish to be critical of that court. The court's error stemmed from the dearth of precedent interpreting and applying *Tiedemann*. Indeed, as the court itself noted, "Just what is 'reasonably probable' is not as clear as the court would like."

violation occurred.[64] If this determination has been made, courts must consider two factors to determine both the seriousness of the due process violation and the remedy that is necessary to ensure that the defendant receives a fundamentally fair trial:

> (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.[65]

And as we stated in *Tiedemann*, though these two factors guide the analysis, "[t]he touchstone for the balancing process is fundamental fairness."[66]

¶ 46 The only remedy sought in this case is dismissal.[67] The district court, after considering the two factors discussed above, concluded that such a remedy was unnecessary. We discuss the district court's consideration of the two factors in turn and conclude

---

[64] *Tiedemann*, 2007 UT 49, ¶ 44.

[65] *Id.*

[66] *Id.* ¶ 45.

[67] Both Ms. DeJesus and the defendant in *State v. Mohamud* sought only dismissal as the remedy for lost evidence. *See Mohamud*, 2017 UT 23, ¶ 5. We note, however, that *Tiedemann* speaks in terms of "sanctions" and "strik[ing] a balance [to] preserve[] defendants' constitutional rights without undue hardship to the prosecution." 2007 UT 49, ¶ 45. Nowhere is dismissal mandated as the sole remedy. Because "[t]he touchstone for the balancing process is fundamental fairness," courts may find that other, less drastic remedies may adequately protect the due process rights of criminal defendants. *Id.* These remedies may include jury instructions requiring the jury to infer that the lost evidence would have corroborated the defendant's version of events, prohibitions on witnesses who would testify as to the content or subject of the lost evidence, or increased time for discovery. Of course, in cases where the State's culpability and the prejudice to the defendant is sufficiently great, dismissal may be the only remedy that can adequately protect the due process rights of the defendant.

that, though the court properly analyzed the culpability of the State in the loss of the evidence, it incorrectly determined that there was no prejudice to the defendant resulting from the lost footage. And upon our consideration of these factors, we conclude that dismissal was an appropriate remedy.

1. Culpability of the State

¶ 47 The district court engaged in a lengthy analysis of the culpability of the State in the loss of the surveillance footage. It rejected the State's argument—an argument the State made again on appeal—that the State would have had no motivation to destroy or fail to preserve the evidence because the evidence would have supported the State's case against Ms. DeJesus. As the court reasoned, "If the recording showed exactly as [Officer] Hansen said, certainly it would seem to this court that common sense would indicate that recording would be retained . . . . The motivation, frankly, to destroy or fail to preserve such a recording would come if the recording supported some other factual situation than the one [Officer] Hansen describes." Thus, there may have been some motivation by the State to permit the footage to be recorded over and lost. Indeed, the court stated that "it is very difficult, if not impossible, for this court to understand why prison personnel would not, with full knowledge that a claimed assault had occurred by an inmate against a guard, maintain a recording of that event."

¶ 48 The court also found, however, "that the lack of the evidence . . . is [not] related to any 'decision' made by anyone." The facts supporting the court's decision were that Ms. Kemp, the investigator, asked someone—an employee she did not know—to make a copy of the recording, followed up over thirty days later, and was informed that "if a hard copy had been made, it was lost." The court noted that Ms. Kemp had failed to follow up within a timeframe that would have permitted the footage to be saved because she was unusually busy at the time and found that "the reasons given for the lack of preservation are believable." Though it stated that "[t]he investigator should have . . . conducted her investigation in a way that retains relevant evidence," it concluded that "[t]he failure to do so, however, was at most negligence, and not gross negligence and certainly not intentional."

¶ 49 The court's factual findings in this regard have not been challenged by either party and do not appear to be clearly erroneous. Further, we see no error in the legal standard employed by the court in its consideration of the State's culpability. Accordingly, we agree with the district court that the State has shown "negligence but not

in a high degree" by failing to preserve the surveillance footage. We turn now to the second *Tiedemann* factor.

2. Prejudice to the Defendant

¶ 50 The second *Tiedemann* factor is "the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence."[68] The district court reasoned that there could be prejudice to Ms. DeJesus resulting from the loss of the evidence "only if the recording shows in essence what defendant claims." And "[b]ecause [the] court d[id] not believe defendant ha[d] shown any reasonable, believable probability the recording showed what defendant claims," it concluded that there was no prejudice.

¶ 51 The court's analysis is flawed because it relied on its earlier conclusion that Ms. DeJesus had failed to establish a reasonable probability that the lost evidence would have been exculpatory—a conclusion that was itself flawed because it imposed too high a burden—to find that there was no prejudice to Ms. DeJesus. This circular reasoning improperly required Ms. DeJesus to establish what the footage would have shown in order to claim that she was prejudiced by its loss. Instead, the court should have focused on the importance of having video footage of the altercation, given the other evidence available in the case. When viewed in this light, the high degree of prejudice to Ms. DeJesus becomes readily apparent.

¶ 52 Ms. DeJesus had called two witnesses to testify during the evidentiary hearing on the motion to dismiss as to the events of the altercation. The first witness, Ms. Dash, was Ms. DeJesus's cellmate during the altercation. As soon as she took the stand, however, the State asked the court to instruct Ms. Dash about her right against self-incrimination, noting that "[s]he was originally charged in this case," and that the charge had been dismissed without prejudice. The State suggested that, "based on her testimony today, [it] could refile that case." Ms. Dash apparently took the State's warning to heart and refused to testify. This left only Ms. Ataata, a fellow inmate and Ms. DeJesus's fiancée, to testify on behalf of Ms. DeJesus. And as the court found, Ms. Ataata's testimony was less believable due to her close relationship with Ms. DeJesus and her partially obstructed view of the altercation. The State's evidence, on the other

---

[68] *Tiedemann*, 2007 UT 49, ¶ 44.

hand, centered entirely on the testimony of Officer Hansen, the officer who was allegedly struck by Ms. DeJesus.

¶ 53 Thus the "context of [this] case"[69] is a literal he-said/she-said dispute between witnesses that would turn on which side's witnesses were most credible. On the State's side, we have a peace officer, Officer Hansen. On Ms. DeJesus's side, we have her fiancée, a fellow inmate, whose testimony was already determined by the district court to be less believable than Officer Hansen's. It is hard to overstate "the materiality and importance of the missing evidence" in this context.[70] The surveillance footage would have changed the entire nature of the case, potentially permitting Ms. DeJesus to show actions consistent with her claims without needing to rely on a potentially unbelievable witness. Indeed, we can conceive of no other evidence that would be as helpful or probative than an actual video recording of the events. Nor can we think of other evidence that can serve as an adequate replacement.

¶ 54 Weighing the two *Tiedemann* factors, we determine that the State's failure to preserve the footage is a severe violation of Ms. DeJesus's right to a fair trial and that dismissal is an appropriate remedy. The State's negligence forced Ms. DeJesus into a situation where the case turned entirely on the believability of each side's witnesses. The State also implicitly encouraged one of Ms. DeJesus's witnesses to not testify, leaving only Ms. Ataata to testify on her behalf—a fellow inmate with a close relationship with Ms. DeJesus who was already found to be less than credible by the court. Thus, Ms. DeJesus was required to attempt to defend against the accusations of the State by pitting the credibility of Ms. Ataata—a witness likely to be seen as biased and not credible—against Officer Hansen. And given the indisputably central role a video recording of the incident would play, we cannot say that the loss of the evidence had only a negligible impact on Ms. DeJesus's right to a fundamentally fair trial. We accordingly hold that, under *Tiedemann*, dismissal is an appropriate remedy. We therefore reverse the decision of the district court and remand for an entry of dismissal.

## Conclusion

¶ 55 The district court erred by applying a more stringent

---

[69] *Id.*

[70] *Id.*

"reasonable probability" standard than is required under the due process analysis articulated in *State v. Tiedemann*.[71] When the correct standard is applied, Ms. DeJesus's proffer as to what the footage may have shown and how the footage would have aided her defense meets the threshold by establishing a reasonable probability that the footage would have been exculpatory. By so doing, Ms. DeJesus established that her due process right to a fair trial was violated. We accordingly must weigh the two *Tiedemann* factors to gauge the severity of the due process violation. And based on the negligence of the State in failing to preserve the footage and the crucial role that footage would have played in the case, we ultimately hold that dismissal is an appropriate remedy. We therefore reverse the district court's denial of Ms. DeJesus's motion to dismiss and remand for that court to enter an order of dismissal.

---

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring the judgment:

¶ 56 In this case, as in *State v. Tiedemann*, 2007 UT 49, ¶ 44, 162 P.3d 1106, the court holds that the State has an obligation to preserve evidence that is reasonably likely to affect the outcome of trial. Further echoing *Tiedemann*, the majority next concludes that the decision on an appropriate remedy for a violation of the duty of preservation depends on a "balance" of two factors—"the culpability of the state and the prejudice to the defendant." *Supra* ¶ 27. And finally, applying these standards, the court concludes that the State's failure to preserve the evidence in question in this case justifies dismissal of the charges against Ms. DeJesus.

¶ 57 I agree with all of these premises and conclusions. The State has a duty to preserve evidence in its possession that is of known materiality to a criminal case. And the destruction of the video recording at issue here is sufficiently troubling that I support the decision to dismiss the charges in this case.

¶ 58 That said, I write separately because I would identify a different basis from the majority for the State's duty of preservation and for the court's power to impose a sanction for a violation of that duty. Unlike the majority, I would not root these principles in the Due Process Clause of the Utah Constitution. I would base them on our inherent power to regulate proceedings in our courts—as reflected in our rules of criminal procedure (specifically, rule 16).

---

[71] 2007 UT 49, ¶ 44, 162 P.3d 1106.

A.C.J. Lee, concurring in part and concurring in the judgment

Thus, I would defer to and leave unaltered the standards set forth in *Tiedemann*. But because those standards are easily sustained without reference to the Due Process Clause, I would exercise the restraint counseled by the doctrine of constitutional avoidance. I would hold that the duty and standards set forth in *Tiedemann* are a matter of inherent judicial power and enforcement of the terms of rule 16 of our rules of criminal procedure. And I would reverse on that basis, without concluding (one way or another) that the *Tiedemann* principles are required as a matter of constitutional law.[72]

¶ 59 The adjustment I propose is a modest one on the surface. But it has both practical and theoretical significance. If we mean to retain the power to refine and adjust the standard set forth in *Tiedemann* (as the majority suggests, *see supra* ¶¶ 21–29), we should avoid rooting that standard in constitutional soil. We should base it instead on our inherent power to regulate practice and procedure in our courts, under rule 16 or otherwise.

I

¶ 60 For at least a couple of centuries, the courts have adverted to the existence of "[c]ertain implied powers" that "necessarily result to our Courts of justice from the nature of their institution." *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812). Such powers include those the courts deem necessary "to preserve [their] own existence and promote the end and object of [their] creation." *Id.* at 33. To that end, the courts have long asserted the authority to impose contempt sanctions in an effort to enforce "the observance of order." *Id.* at 34. As a close cousin to the contempt power, the courts have also long maintained the power to sanction a party for destroying evidence of relevance to the disposition of a case.[73]

---

[72] My point is mostly theoretical: I would retain each of the legal standards set forth in *Tiedemann* and reinforced again today, and alter only the theoretical basis for those standards. But theory matters. It matters most, perhaps, when it comes to our power of judicial review under the constitution. A judicial declaration of a constitutional requirement is a matter of grave significance. When we exercise that power, we remove the matter from further adjustment or amendment at the policymaking level. That is a significant step. We should not take it lightly.

[73] *See* Bart S. Wilhoit, Comment, *Spoliation of Evidence: The Viability of Four Emerging Torts*, 46 UCLA L. Rev. 631, 637–38 (1998) ("Although the common law did not recognize an independent

(Continued)

A.C.J. Lee, concurring in part and concurring in the judgment

¶ 61 This power is sometimes framed as a matter of the common law. The common law doctrine of relevance to the destruction of material evidence is called *spoliation*.[74] There is a split in the courts on whether to recognize a common-law claim for damages for *spoliation*.[75] But most courts have recognized some form of common-law or inherent-power-based doctrine that allows for the imposition of sanctions against a party who destroys or fails to preserve

---

action in tort, common-law courts allowed juries to infer that destroyed evidence would have worked against the spoliating party. Beginning with *Armory v. Delamirie*, 93 Eng. Rep. 664 (K.B. 1772) in 1772, courts began to establish legal precedent to remedy the destruction of evidence."); Jonathan Judge, *Reconsidering Spoliation: Common-Sense Alternatives to the Spoliation Tort*, 2001 WIS. L. REV. 441, 446–47 ("Courts have tried to fill these gaps [of sanctioning spoliation] by relying on the 'inherent powers' of the court—powers needed for the exercise of all others. Since the court must structure its proceedings for the most effective ascertainment of the truth, it arguably can punish spoliation of any sort that the court believes is intended to hinder its work." (footnotes omitted)); 61A AM. JUR. 2d *Pleading* § 601 ("[T]he federal courts possess the inherent power to manage their own affairs to achieve the orderly and expeditious disposition of cases. This includes the inherent power to impose reasonable and appropriate sanctions for conduct which abuses the judicial process, since the court possesses the power to punish for contempt, as well as the power to control admission to its bar, discipline attorneys who appear before it, dismiss a lawsuit or enter a default judgment, impose fines, and assess attorney's fees." (footnotes omitted)).

[74] The term looks like a typo—a mistaken attempt to speak of *spoilation*. But the term *spoliation* has deep roots in the common law. *See supra* ¶ 60, n.73. And it is traced etymologically to the Latin *spoliationem*, meaning "a robbing, plundering, pillaging." *Spoliation*, ONLINE ETYMOLOGY DICTIONARY, http://www.etymonline.com/index.php?allowed_in_frame=0&search=spoliation (last visited Mar. 27, 2017).

[75] *See generally Intentional Spoliation of Evidence, Interfering with Prospective Civil Action, As Actionable*, 70 A.L.R.4th 984 (noting that some states do not recognize spoliation as a common law tort, while setting forth the elements of the tort in other states).

A.C.J. Lee, concurring in part and concurring in the judgment

evidence in litigation.[76] And, recognizing that not all acts of *spoliation* have the same impact, the common law has carved out room for different remedies—ranging from a judgment against the infringing party to a mere instruction permitting the jury to draw an adverse inference that the missing evidence would have harmed that party's case.[77]

¶ 62 Our courts have also formulated rules of procedure to regulate the practice in this area. Rule 16 of the federal rules of criminal procedure requires the government to disclose or permit the defendant to inspect and copy evidence in its "possession, custody, or control" that it intends to introduce at trial or that is material to the preparation of the defense of a case. FED. R. CRIM. P. 16. Covered evidence includes "photograph books, papers, documents, data, photographs, tangible objects, [and] buildings or places." *Id.* 16(a)(1)(E). In light of the duty to disclose, the federal courts have held that the government bears a duty to preserve discoverable

---

[76] *See, e.g.*, *In re Evans*, 130 P. 217, 224 (Utah 1913) ("It is undoubtedly true that courts of general and superior jurisdiction possess certain inherent powers not derived from any statute. Among these are the power to punish for contempt, to make, modify, and enforce rules for the regulation of the business before the court . . . . Such inherent powers of courts are necessary to the proper discharge of their duties."); *Restaurant Mgmt. Co. v. Kidde-Fenwal, Inc.*, 986 P.2d 504, 507–08 (N.M. Ct. App. 1999) ("A remedy for the destruction of evidence may be available pursuant to the inherent power of the courts 'to impose sanctions on both litigants and attorneys in order to regulate their docket[s], promote judicial efficiency, and deter frivolous claims.' . . . The rationale underlying the existence of the inherent power of the courts is that 'a court must be able to command the obedience of litigants and their attorneys if it is to perform its judicial functions.'" (alteration in original) (citations omitted)).

[77] *See, e.g.*, *Fines v. Ressler Enters., Inc.*, 820 N.W.2d 688, 694 (N.D. 2012) (affirming the district court's dismissal of a case where the plaintiff was found to have destroyed evidence); *Stender v. Vincent*, 992 P.2d 50, 60 (Haw. 2000) (holding that it was not an abuse of discretion for a trial court to give an "adverse inference instruction" against a party that destroyed evidence).

A.C.J. Lee, concurring in part and concurring in the judgment

evidence.[78] And when that duty is breached, the federal courts have exercised their discretion under the rules to impose a sanction—to enter "any . . . order that is just under the circumstances." *Id.* 16(d)(2)(D). The sanction orders imposed for failure to preserve have included an adverse inference instruction[79] and dismissal of criminal charges.[80] In deciding on the appropriate sanction, moreover, the courts have articulated a number of factors to be considered. Those factors include the reasons for the government's nondisclosure, the extent of the prejudice to the defense, and the feasibility of rectifying the prejudice through a continuance or otherwise.[81]

---

[78] *See* 3C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE 189 (2008) (citing Advisory Committee Notes to Federal Rules of Criminal Procedure).

[79] *See Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) ("In order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed."); *People v. Kelly*, 467 N.E.2d 498, 501 (N.Y. 1984) (applying New York rule, which parallels federal rule; concluding that dismissal was an abuse of discretion where adverse inference instruction would have adequately remedied prejudice caused by government's destruction of evidence).

[80] *See United States v. Zaragoza-Moreira*, 780 F.3d 971, 982 (9th Cir. 2015) (directing the district court on remand to dismiss the indictment against the defendant because the government had the duty to preserve evidence but failed to do so); *People v. Howard*, 469 N.Y.S.2d 871, 874 (Crim. Ct. 1983) (applying New York rule; concluding that sanction of dismissal was appropriate).

[81] *See, e.g., Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, No. 97-5089, 1998 WL 68879, at *4 (10th Cir. Feb. 20, 1998) ("When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence, and (2) the degree of actual prejudice to the other party."); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 946 (11th Cir. 2005) (considering culpability of the spoliator and prejudice to the opposing party in assessing whether dismissal is warranted or an adverse inference instruction is appropriate).

A.C.J. Lee, concurring in part and concurring in the judgment

¶ 63 Our Utah rule is a general parallel of the federal provision. Like the federal rule, our criminal rule 16 requires the government to "disclose to the defense" certain information in its possession. UTAH R. CRIM. P. 16(a). Under the Utah rule, the information to be disclosed includes "evidence which the court determines on good cause shown should be made available to the defendant in order for the defendant to adequately prepare his defense." *Id*. 16(a)(5). And our rule also recognizes the authority of the court to enter sanctions for any failure "to comply with this rule." *Id*. 16(g). Like the federal rule, our rule spells out specific sanctions that may be entered, but also states that the court "may enter such other order as it deems just under the circumstances." *Id*. 16(g).

II

¶ 64 The *Tiedemann* case was decided against the above backdrop. Mr. Tiedemann's case came before us on an interlocutory appeal. Tiedemann stood charged with aggravated murder, aggravated kidnapping, and aggravated sexual assault. He was initially declared incompetent to stand trial. 2007 UT 49, ¶ 7. And the charges against him were dismissed after he was subjected to civil commitment. *Id*. At that point Tiedemann was deemed "unlikely to ever be found competent to stand trial." *Id*. And "the state evidence custodian notified the investigating officer that physical evidence from the case would be destroyed unless an objection was filed within thirty days." *Id*. ¶ 8. Absent any objection, certain physical evidence was destroyed. When Tiedemann was released from the state hospital many years later, the State refiled charges against him. Tiedemann, now deemed competent to stand trial, moved "to dismiss the case due to destruction of evidence." *Id*. ¶ 10.

¶ 65 The district court denied Tiedemann's motion, and this court agreed to consider that decision on interlocutory appeal. *Id*. In challenging the denial of the motion to dismiss, Tiedemann asserted a federal due process argument. Citing *Arizona v. Youngblood*, 488 U.S. 51 (1988), Tiedemann argued that his right to due process was infringed because "the evidence may have been exculpatory, no comparable evidence still exists, and the destruction was done in bad faith." *Tiedemann*, 2007 UT 49, ¶ 30. But Tiedemann also asserted alternative grounds for his motion to dismiss. He cited rule 16 of our rules of criminal procedure[82] as well as the Due Process Clause of the

---

[82] Brief for Tiedemann at 50, *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106 (arguing that the prosecution has a duty to preserve evidence and that the evidence in this case "would have been

(Continued)

A.C.J. Lee, concurring in part and concurring in the judgment

Utah Constitution. And he urged the court to dismiss the charges against him even if it did not find the "bad faith" required as a matter of federal due process under *Youngblood,* 488 U.S. at 58.[83]

¶ 66 The *Tiedemann* majority found a lack of "any degree of culpability or bad faith on the part of the State." 2007 UT 49, ¶ 46. So it rejected Tiedemann's federal due process claim. But the court accepted his invitation to establish a standard that could protect a defendant even absent such a showing. In articulating such a standard, the *Tiedemann* court cited rule 16 of our criminal rules, noting that this rule "imposes broad obligations on prosecutors to produce" evidence material to a defense "or make it available to a defendant." *Id.* ¶ 40. Citing prior cases interpreting this rule, *Tiedemann* held that "'[t]he prosecutor's good faith should not have . . . any impact on the trial court's determination of whether the prosecutor had violated his discovery duties.'" *Id.* (quoting *State v. Knight*, 734 P.2d 913, 918 n.5 (Utah 1987)). And, in further reliance on our rule 16 precedents, the *Tiedemann* majority listed factors of relevance to the determination whether the State is in violation of its duties under the rule, including "the culpability of the prosecutor" and the impact of the violation on the defense (or likely "prejudice" to the outcome). *Id.* ¶ 41 (quoting *State v. Kallin*, 877 P.2d 128, 143 (Utah 1994)).

¶ 67 The holding in *Tiedemann* was expressly tied to some degree to rule 16. The majority stated that "[o]ur approach under rule 16 should govern the destruction of evidence," holding that "the culpability or bad faith of the state should be only one consideration, not a bright line test." *Id.* Elsewhere, the *Tiedemann* court also attributed its standard to the Due Process Clause of our Utah Constitution. *Id.* ¶ 44 (citing UTAH CONST. art. I, § 7). But the authorities it cited were tied to a large extent to standards like that set forth in our criminal rule 16.[84] Even the Vermont case from which

---

discoverable under Utah law" under rule 16 of the Utah Rules of Criminal Procedure).

[83] Brief for Tiedemann at 46–47 (requesting that the court "not now require . . . a showing [of bad faith] under a due process analysis for the state constitution," and urging the court to instead consider other factors, including "the degree of prejudice to the defendant").

[84] *See Thorne v. Dep't of Pub. Safety*, 774 P.2d 1326, 1330 & n.8 (Alaska 1989); *Hammond v. State*, 569 A.2d 81, 88 (Del. 1989); *State v.*

(Continued)

A.C.J. Lee, concurring in part and concurring in the judgment

*Tiedemann* drew its standard, *State v. Delisle*, 648 A.2d 632 (Vt. 1994), is along these lines. The *Delisle* decision is admittedly based on the Vermont Constitution. But the holding in *Delisle* is ultimately based not on a general right to due process but on that state constitution's guarantee of a right of a criminal defendant "'to call for evidence in his favor.'" *See Delisle*, 648 A.2d at 642 (quoting Vᴛ. Cᴏɴsᴛ. ch. 1, art. 10). In light of that right, the *Delisle* court found a duty of the government to preserve evidence, and held that dismissal may be appropriate depending on the importance of the evidence in question and the strength of other evidence of guilt. *Id.* at 642–43.

¶ 68 I would interpret *Tiedemann* as resting on our inherent power to regulate practice and procedure in criminal litigation in our courts as reflected in our criminal rule 16 and the extensive authorities cited above. In so doing, I would acknowledge the fact that *Tiedemann* purported to state a requirement of state due process. And I would leave open the possibility that our Utah Due Process Clause may have a role to play in establishing a "floor" or minimum standard protecting an accused whose defense is interfered with by the destruction of material evidence. But I would not "double down" on the constitutional basis for the standard we have articulated in this area. Instead, in the spirit of constitutional avoidance, and in light of the settled, alternative grounds for our authority in this area, I would root the *Tiedemann* standards in our inherent power and rulemaking power under criminal rule 16.

### III

¶ 69 The proposed reformation of *Tiedemann* is a simple one. I would not alter any of the standards set forth in that opinion. I would simply recast the legal basis for our holding, tying it to our inherent power as reflected in rule 16. To do so, we need to say only what the federal courts have long said under the counterpart federal rule—that the government's duty to disclose material evidence encompasses a duty to preserve such evidence. *See supra* ¶ 62. *Tiedemann*, as noted above, effectively did that. I would make that more explicit here. And I would state this as the basis (going forward) for the standards that we have articulated in this area.

¶ 70 This adjustment is subtle. But it is hardly without consequence. The doctrine of constitutional avoidance wisely counsels against resolving cases on constitutional grounds when a

---

*Matafeo*, 787 P.2d 671, 673 (Haw. 1990); *State v. Osakalumi*, 461 S.E.2d 504, 511 n.10 (W. Va. 1995).

A.C.J. Lee, concurring in part and concurring in the judgment

non-constitutional ground is available. *See Nevares v. M.L.S.*, 2015 UT 34, ¶¶ 38–39, 345 P.3d 719. For good reasons. Our constitutional decisions are set in relative stone: They place matters resolved by them beyond the policy reach of this or other branches of government, and they establish precedent that we ourselves may be bound by under the doctrine of *stare decisis*. For these and other sound reasons, our courts have long deemed *constitutional* grounds a matter of last resort.

¶ 71 Our cases have stated this principle in the specific context of the Due Process Clause. We have warned of the perils of treating this provision as a "free-wheeling constitutional license for courts to assure fairness on a case-by-case basis." *In re Discipline of Steffensen*, 2016 UT 18, ¶ 7, 373 P.3d 186. We have indicated that "[w]e retain discretionary license to assure fair procedure in the cases that proceed through our justice system." *Id*. But we have explained that "our usual course for doing so is by promulgating rules of procedure." *Id*.; *see also Ownbey v. Morgan*, 256 U.S. 94, 110–11 (1921) ("The due process clause does not impose upon the states a duty to establish ideal systems for the administration of justice, with every modern improvement and with provision against every possible hardship that may befall.").

¶ 72 This is a sound, practical reason for reformulating the theoretical basis for the framework set forth in *Tiedemann*.[85] By relocating the *Tiedemann* standard to rule 16 and our inherent power, we avoid the entrenchment inherent in a constitutional decision. And instead we tap into the process we have put in place for the promulgation and amendment of the rules governing practice and procedure in our courts.

---

[85] We could identify additional reasons—in the premises for the interpretive methodology of originalism, for example. *In re K.A.S.*, 2016 UT 55, ¶ 46 (Lee, J., dissenting) (advocating an originalist basis for our interpretation of the Utah Due Process Clause—a "historically driven test 'measured by reference to "traditional notions of fair play and substantial justice"'"—while noting that our "usual course" for assuring "fair procedure" is to promulgate "rules of procedure"). But we need not do so to decide this case. We can save for another day the question whether there may *also* be a constitutional basis for the standards in *Tiedemann*—a minimum constitutional guarantee in this area. I would take that approach here.

A.C.J. Lee, concurring in part and concurring in the judgment

¶ 73 That seemingly minor adjustment is a significant one. Our rules process is set up in a manner that facilitates both ready decision-making and wide-ranging input from the bar. Through our advisory committees and public comment process, we receive input on proposed amendments from a wide range of interested parties. And through the rules process, we can make ready adjustments to our rules on the fly—as soon as we are convinced of the need to make a change.

¶ 74 None of this holds in the context of the decisions we make in the exercise of our appellate jurisdiction. When we exercise that power we maintain a passive posture. We maintain neither "FORCE nor WILL, but merely judgment." THE FEDERALIST No. 78 (Alexander Hamilton). We "can take no active resolution whatever," *id.*, in that we do not set our own agenda, but must await a judicial case that presents a live, disputed issue before we have the authority to tackle it. That is as it should be in the exercise of our appellate jurisdiction. When we endeavor to set rules to assure fair procedure in our courts, however, we need greater flexibility.

¶ 75 This case illustrates the point. Because the "touchstone" of the *Tiedemann* standard is "fundamental fairness," the court goes out of its way to emphasize that the standards we set forth in that case are not the be-all-end-all of the matter. *Supra* ¶ 46 n.67. It notes, in particular, that we may yet find new "less drastic" remedies than the one identified in *Tiedemann*. *Id.* And presumably the court is opening the door to the possibility of further adjustments to the *Tiedemann* standard on other points. I assume that's the point of reiterating a "touchstone" as broad as "fundamental fairness."

¶ 76 I'm all for fundamental fairness. But if that is our goal, we should root our power in a ground that is better suited to vindicating it. When we make rules of practice and procedure we need to be able to set our own agenda. We need the flexibility to make adjustments to our law as we see fit and as new policies and procedures come to our attention. Yet that highlights a defect in the majority's approach. The constitution is not a charter for the promulgation of ever-evolving standards of practice. Its premise is the opposite—of the need for the establishment of "certain limits not to be transcended" and "designed to be permanent." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803).

¶ 77 We distort the constitution when we press it into the sort of service for which our rules process is designed. I would avoid that distortion here. I would do so through the doctrine of constitutional avoidance—by reconceptualizing the legal foundation of *Tiedemann* while still retaining its doctrinal elements.

A.C.J. Lee, concurring in part and concurring in the judgment

IV

¶ 78 I see no barrier to my approach in any of the majority's objections. First, there is nothing "novel" about resolving a case on non-constitutional grounds when a constitutional decision is unnecessary. *See supra* ¶ 33 (criticizing my approach as somehow "novel"). And that is all that I am proposing. My point is not that "we should avoid procedural due process questions 'properly presented by the record' *because we have inherent authority to make rules of procedure.*" *Supra* ¶ 33 (emphasis added). It is that we already have an applicable rule of procedure (rule 16) that can stand as a basis for our articulation of standards regulating the spoliation of evidence by the prosecution. Because *Tiedemann* can be understood to be rooted in our interpretation of rule 16 (and the exercise of the inherent power recognized in that rule), we need not conclude that the Due Process Clause requires the standards we articulated in *Tiedemann*.

¶ 79 I recognize that the *Tiedemann* opinion purported to "plant[]" its "test in constitutional soil." *Supra* ¶ 32. But it also cited rule 16, as have the courts in other jurisdictions that have adopted similar tests. And that fact renders this a straightforward application of the doctrine of constitutional avoidance: Because we have a rule of procedure that regulates spoliation of evidence and reflects our inherent power in this field, we can easily deem the standards set forth in *Tiedemann* a reflection of our inherent power in this field—without deciding whether the Due Process Clause demands the same standard. Thus, we can construe *Tiedemann* as declaring that this court has satisfied the Due Process Clause by promulgating rule 16. We need not deem *Tiedemann* to establish the rule 16 standard as the constitutional floor under the Due Process Clause.

¶ 80 Second, the court is wrong to insist that my approach only avoids "certain constitutional issues" while giving rise to other "*new* constitutional issues," such as those implicated in a constitutional challenge to the application of rule 16. *Supra* ¶ 33 n.48. The tradeoff identified by the majority is illusory. At most, the court is observing that my approach leaves open the *possibility* that a court's application of a standard rooted in rule 16 "could be subject to constitutional challenge." *Supra* ¶ 33 n.48. Yet the majority's approach makes constitutional analysis not just possible but *required*; if the *Tiedemann* standard is rooted in due process, then a court is engaged in constitutional decision-making in every case in which there is an allegation of prosecutorial spoliation of evidence.

¶ 81 It is no answer to assert that a rules-based approach "would be a poor substitute for the protections, including more robust

A.C.J. Lee, concurring in part and concurring in the judgment

appellate review, that our interpretation of the due process clause affords criminal defendants,"[86] or that a due process conception of *Tiedemann* is necessary to preserve "this court's previous conclusion that government loss or destruction of exculpatory evidence directly implicates due process." *Supra* ¶ 35. The majority's critiques along these lines are circular. They assume that the *Tiedemann* standard is in fact required by the terms of the Due Process Clause. That is the question that I would avoid here. I see nothing in the *Tiedemann* opinion that supports the conclusion that the constitutional guarantee of "due process of law" was understood at the time of the framing of the constitution to guarantee the standards announced in that opinion. *Tiedemann*, in fact, professed a prerogative of making state constitutional law on the basis of "sister state law" and "policy arguments." 2007 UT 49, ¶ 37. And it repudiated the originalist approach to constitutional interpretation announced in some of this court's decisions. *See id.* (noting the originalist approach to constitutional interpretation but deeming it only "persuasive in some cases" and not required). Those are reasons alone to question the constitutional foundation of the *Tiedemann* standard. Yet we need not reach that issue here. We can decide this case by recognizing only a non-constitutional basis for the *Tiedemann* approach.

¶ 82 Neither *Tiedemann* nor the briefing presented in this case tells us anything of relevance to whether the standard we apply today is a "suitable floor concerning the destruction of evidence." *Supra* ¶ 32 n.45. That question, in my view, turns entirely on material not yet examined by this court—on whether the guarantee of "due process of law" would have been understood in 1896 to encompass the protections we recognized in *Tiedemann*. The majority offers no historical or textual support for its conclusion, and without it I cannot see how the court can insist that *Tiedemann* is a "suitable floor," much less that it is the protection guaranteed by the founders of this state. I would reserve that analysis for a different case in

---

[86] I have no problem with the court's aspiration for more robust appellate review in cases involving allegations of prosecutorial spoliation of evidence. *See supra* ¶ 35. But we can achieve that outcome without attributing our preferences to the dictates of the Utah Constitution. We can provide for more searching appellate review by rule. And on this and all points of policy, I far prefer the rulemaking route to a decision to open the door to "reinterpreting" the constitution each time we wish to add to the protections prescribed in prior cases.

A.C.J. Lee, concurring in part and concurring in the judgment

which we have briefing and argument of relevance to this inquiry. And I would conclude that *Tiedemann* simply dictates that rule 16 does not fall *below* the floor of the Due Process Clause, whatever that floor may ultimately be.

———————